**Milton A. RUDIN, Plaintiff,**

v.

**DOW JONES & COMPANY, INC., Defendant.**

No. 79 Civ. 433(MEL).

United States District Court, S.D. New York.

Feb. 24, 1983.

See also, D.C., 510 F.Supp. 210.

Coblence & Warner, New York City, for plaintiff; Kenneth E. Warner, Stephen E. Kaufman, P.C., New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant; Frederick T. Davis, Robert D. Sack, Ann Loeb, New York City, of counsel.

LASKER, District Judge.

### INTRODUCTION

Milton Rudin, an attorney, businessman and philanthropist whose clients include many of the world's most celebrated show-business personalities, brings this defamation action against Dow Jones & Company ("Dow"), the publisher of "Barron's Business and Financial Weekly" ("Barron's"), based upon a caption that Barron's attached to a letter to the editor written by Rudin and published in the January 15, 1979 issue of Barron's. The undisputed facts are as follows:

On November 27, 1978, in its regular column "Up & Down Wall Street," Barron's commented on the purchase of stock in the Great Lakes Dredge and Dock Company by a group including Frank Sinatra, Jr., Rudin, and three others:

"A GAMBLING stock it isn't, But then, Great Lakes Dredge and Dock would scarcely be mistaken for a Vegas casino. As for Atlantic City, we suspect that the closest the company would come to that spa is if perchance one of its dredges were working offshore. So why would Frank Sinatra and a group of four others, including his attorney, Milton Rudin (who not long ago joined Sinatra in buying a huge stake in Del Webb and eventually gaining a board seat before disposing of their stock this year to Ramada Inns), plunk down a cool $2.8 million to buy 107,500 shares, or slightly over 5% of the outstanding stock, of Great Lakes?

The 13D filed with the SEC by Sinatra & Friends avers that the stock was purchased for 'investment purposes.' The folks at Great Lakes Dredge can't shed any more light on the matter, either. They report that business is good, profits are at record levels and the backlog is high. But as to why old Blue Eyes et al acquired the block of stock, an executive declares, 'We've no idea whatsoever.' Our efforts to reach the singer and others were to no avail. One thing we do know. Say what you want about Great Lakes Dredge, a fine old company with a respectable record, show biz it's not."

Barron's, November 27, 1978, p. 38 (Pl.Ex. 1).

In response to the publication of this item, Rudin wrote to Barron's on January 2, 1979, and invited Barron's to publish his letter. The letter, without the two final paragraphs, was published on January 15, 1979 in the column "Barron's Mailbag," which consists of letters to the editor. Barron's caption for the letter was "SINATRA'S MOUTHPIECE." The letter appeared as follows:

"SINATRA'S MOUTHPIECE

To the Editor:

I have finally found time to deal with trivia; I am referring to the article which appeared in the Nov. 27 issue of your publication concerning the purchase by Harvey Silbert, Frank Sinatra, Jerry Weintraub and myself of over 100,000 shares of Great Lakes Dredge & Dock Co.

Your article seems to indicate that neither Mr. Sinatra and I, nor the other individuals joining us in filing as 'a group,' have a limited amount of intelligence. Obviously, you are of the view that we can only understand gambling stocks or securities of companies involved in the entertainment industry.

But it astounds me that your staff, writing for a publication that claims that it reports accurately on matters relating to investments, did not have intelligence to understand why we purchased Great Lakes. In addition to being unintelligent, they are evidently very lazy.

If your writer had examined the 13D filed with the SEC, he would have noted that initial purchases were made by Mr. Sinatra and myself at a cost basis of approximately $22 a share. Also, the subsequent purchases were made under $30 a share.

On the basis of $22 a share, and noting that Great Lakes paid a dividend of $2.50 a share in 1978, your reporter, if he completed sixth grade education, would have been able to note that we are getting a 10% return on our investment.

We bought the stock prior to the announcement that Great Lakes' earnings would be approximately $7 a share. Because we don't read Barron's, I guess we very stupidly invested in this stock, which at present price levels is yielding about 7% per annum and selling at a modest multiple of five times earnings.

MILTON A. RUDIN
Beverly Hills, Calif."

Barron's, January 15, 1979, p. 7 (Pl.Ex. 3).

On January 16, 1979 Rudin's law firm sent a telegram to Barron's protesting the use of the caption "Sinatra's Mouthpiece," stating it to be a "defamatory reference" to Rudin in that it impugned "his professional

integrity and competence" and "was intended to and does hold Mr. Rudin up to obloquy and ridicule." (Pl.Ex. 4). The telegram also demanded that Barron's print a retraction. On January 22, 1979, in the succeeding issue, the "Barron's Mailbag" column began with the following editorial statement:

> "Milton Rudin, an attorney who represents Frank Sinatra, has objected to our referring to him as 'Sinatra's mouthpiece' in last week's Mailbag column. We meant to cast no aspersions on Mr. Rudin. Our dictionary defines 'mouthpiece' as 'spokesman.'"

Barron's, January 22, 1979, p. 7 (Pl.Ex. 5). The instant lawsuit followed.

In an earlier opinion this Court denied Dow's motion to dismiss Rudin's defamation claim, rejecting Dow's argument that the caption "Sinatra's Mouthpiece" was not susceptible of a defamatory meaning. *See* 510 F.Supp. 210 (S.D.N.Y.1981). Under New York law,[1] "[i]f the contested statements are reasonably susceptible of a defamatory connotation, then 'it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.'" *James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834 (1976), *quoting Mencher v. Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257, 259 (1947). Although Dow correctly pointed out on its motion to dismiss that the primary dictionary definition of "mouthpiece" is "spokesman," Rudin established that the word is also capable of conveying a pejorative and potentially defamatory meaning, particularly when applied to an attorney. The word "mouthpiece," Rudin demonstrated, is used as a synonym of terms such as "puppet, cat's paw, tool, instrument; operative, front, mercenary, servant, hireling, henchman," (Rodale, The Synonym Finder (1978)), and when used of an attorney is often employed in contexts suggestive of the underworld. *See, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 355, 94 S.Ct. 2997, 3014, 41 L.Ed.2d 789 (1974) (Burger, C.J.,

dissenting) ("irresponsible reporters ... might, for example, describe the lawyer as a 'mob mouthpiece' for representing a client with a serious prior criminal record"). Furthermore, because the word "mouthpiece" can be used to denote one who merely carries out the wishes of another and exercises no independent judgment, we held, on the motion to dismiss, that using the word of an attorney could disparage him professionally in light of ethical standards requiring attorneys to exercise independent judgment and remain within the bounds of the law in representing their clients. *See Johnson v. United States,* 360 F.2d 844, 846 (D.C.Cir. 1966) (Burger, J., concurring) ("One result of these fallacious and blurred conceptions of the advocate's function is the public image of the 'criminal lawyer' as the servile 'mouthpiece' or the alter ego of the accused. ... This is more than a fallacy; it is totally incompatible with the basic duty of a lawyer as an officer of the court and contrary to the traditions and ethics of the legal profession"). Moreover, Dow conceded that "mouthpiece" can convey a defamatory meaning when used to associate someone with an unpopular cause or personality. Hence, we held that Rudin was entitled to an opportunity to prove his claim that since Sinatra has been associated (incorrectly according to Rudin) in the public mind with organized crime, Barron's caption defamed Rudin by exploiting this association through the use of the word "mouthpiece." Because Rudin showed that Barron's caption was at least susceptible of the defamatory meaning he ascribes to it, the question of whether the phrase in fact conveyed that meaning to Barron's readers was left for trial.

Both parties subsequently elected to proceed without a jury, and following trial the matter is now before the Court for decision.

## I.

*Plaintiff's Evidence*

Rudin presented four basic categories of evidence in support of his claim that the caption "Sinatra's Mouthpiece" was likely

---

**1.** Both parties agree that New York law governs this action.

to have been understood by Barron's readers as a defamatory statement about Rudin: testimony by lawyers as to their understanding of the implications of calling an attorney a "mouthpiece;" expert testimony by a psychologist as to studies he performed to determine the reader's reaction to the word "mouthpiece;" dictionary entries; and examples of the word's actual use in newspapers and other publications. Rudin also testified himself. The testimonial evidence is summarized below.

Rudin called three prominent attorneys to testify on the import of calling a lawyer a "mouthpiece:" Bruce Kauffman, a former Justice of the Pennsylvania Supreme Court, now head of the litigation department of the Philadelphia firm of Dilworth, Paxson, Kalish, Levy & Coleman; Peter Fleming, Jr., a partner in the New York City firm of Curtis, Mallet-Prevost, Colt & Mosle; and Paul Curran, former United States Attorney for the Southern District of New York and currently a partner in the New York City firm of Kaye, Scholer, Fierman, Hays & Handler.

Judge Kauffman testified that the word "mouthpiece," when used of an attorney, "clearly communicates one who is more concerned with fulfilling the directions and instructions of a client, usually a criminal client, and even more specifically an underworld client, and has little or no concern with the code of professional responsibility, the rules of court and the applicable law" (Tr. 15–16). In Judge Kauffman's view, the most important attributes of an attorney are "independence and integrity;" a mouthpiece is a lawyer who lacks those qualities (Tr. 16). Judge Kauffman stated that his view of the meaning conveyed by calling an attorney a mouthpiece is shared by other lawyers with whom he had discussed the matter, and that he believes the general public shares this view as well: "... all you have to do is watch television and go to movies and read novels. I have never in my life heard the word mouthpiece used as a flattering name for a lawyer" (Tr. 24–25).

Judge Kauffman has known Rudin for approximately ten years, and described him as "a man of known integrity, honor and ethics" (Tr. 17). He stated on cross-examination that, although he did not personally think less of Rudin after seeing the caption in Barron's, "to refer to Mr. Rudin as Sinatra's Mouthpiece confirms the general view of people that a mouthpiece is an underworld lawyer and is one who has no independence and ... is concerned not as an officer of the court to do justice, but solely to represent the interests of his client" (Tr. 20).

Peter Fleming testified to a similar view of the meaning conveyed by referring to an attorney as a mouthpiece. Fleming stated that the term implies an absence of independence which is "offensive to my concept of a lawyer's function" (Tr. 36). Like Judge Kauffman, Fleming said that he had discussed the question with other lawyers and that they shared his estimate of the offensive nature of "mouthpiece" as an appellation for an attorney. (Tr. 38). Fleming stated that he is familiar with Rudin and that Rudin's conduct as an attorney exemplifies the sense of independent judgment that Fleming considers central to an attorney's proper role. (Tr. 38).

Paul Curran, who was not acquainted with Rudin, stated that his impression of an attorney who is a mouthpiece is "someone who is more of a tool for his client ... than he should be. ... And my understanding of the term ... is that it is most commonly used in the context of organized crime situations" (Tr. 172). In Curran's view, an attorney "must not simply do what the client tells him the client wants him to do, no matter what the circumstances." To call an attorney a mouthpiece therefore calls into question the lawyer's sense of professional responsibility (Tr. 172).

A second category of evidence presented by Rudin was the expert testimony of Dr. Robert Buckhout, a professor of psychology at Brooklyn College. Dr. Buckhout conducted two studies intended to demonstrate the contrast, if any, between a reader's impressions of an attorney referred to as

another's "spokesman," on the one hand, and an attorney referred to as another's "mouthpiece" on the other. To this end Dr. Buckhout administered questionnaires which asked the respondent to indicate his or her impression of an attorney referred to, in study # 1, as "John Doe's Spokesman" or as "John Doe's Mouthpiece," and, in study # 2, as "Sinatra's Spokesman" or "Sinatra's Mouthpiece." In each of the studies the respondents were asked to record their impressions by rating the imaginary person on each of five different "scales" or "dimensions" which Dr. Buckhout had selected as appropriate for measuring a reader's reactions to such an individual. The scales were "just/unjust," "clean/dirty," "ethical/unethical," "advisor/puppet," and "honest/crooked." Each respondent rated the person indicated on the questionnaire on a scale of one to seven for each of the five dimensions listed above, a rating of one indicating, for example, the strongest possible "just" impression, and a rating of seven indicating the strongest possible "unjust" impression.

In his first study, conducted in the fall of 1981, Dr. Buckhout analyzed responses from 89 persons interviewed in New York City's financial district by Dr. Buckhout's graduate students.[2] Approximately half of those interviewed were given a questionnaire asking for their impression of an attorney referred to as "John Doe's Spokesman" in a headline over a letter to the editor; the other half were given an identical questionnaire except for the substitution of "John Doe's Mouthpiece" for "John Doe's Spokesman" (Pl.Ex. 10). Dr. Buckhout testified that the results of study # 1 established

that, to a statistically significant degree, the respondents rated "John Doe's Mouthpiece" as more negative than "John Doe's Spokesman" on all of the dimensions but one ("advisor/puppet") (Tr. 56–57).[3]

Dr. Buckhout used the same procedure for his second study, conducted in the spring of 1982, except that instead of the reference to John Doe, the questionnaire asked the respondents for their reaction to the phrases "Sinatra's Spokesman" and "Sinatra's Mouthpiece." Dr. Buckhout combined the results of this study with the results of the first study,[4] and testified that the overall data established a statistically significant difference between respondents' impressions of the headlines using the word "spokesman" and those using the word "mouthpiece"—regardless of whether the word accompanied "John Doe" or "Sinatra" —on all five of the dimensions on which respondents rated the person referred to in the headline (Tr. 61; see Pl.Ex. 12). Dr. Buckhout testified that he applied an "analysis of variance" (a statistical technique) to determine whether the fact that some of the respondents were given questionnaires referring to Sinatra while others were given questionnaires referring to John Doe could have influenced the finding described above. The analysis of variance showed that the use of "Sinatra" rather than "John Doe" in half of the questionnaires did not affect the statistically significant difference that Dr. Buckhout found between respondents' impressions of "spokesman" and of "mouthpiece" (Tr. 118–19). Dr. Buckhout further noted that the combined results of the studies showed *no* statistically significant difference between respondents' im-

---

2. In order to obtain responses from a population similar to Barron's readership, Dr. Buckhout selected from among those interviewed a group whose demographic characteristics matched a demographic profile of Barron's readers. (Pl.Ex. 8). The responses of this group were then compiled to obtain the results of the study presented at trial. Although the group of respondents finally chosen for the study did not entirely match the Barron's readership profile with regard to occupation and, of course, geographical distribution, Dr. Buckhout testified that he believed the sample sufficiently comparable to Barron's readership to serve as

a basis for conclusions about the likely responses of Barron's readers to the same questionnaire (Tr. 66; see Pl.Exs. 13A and 13B).

3. On the "advisor/puppet" dimension the respondents' answers did show that "John Doe's Spokesman" was rated closer to the "advisor" end of the scale than "John Doe's Mouthpiece," but the difference was not statistically significant (Tr. 57).

4. Dr. Buckhout did not testify as to the separate results of study # 2.

pressions of "John Doe's Spokesman" and their impressions of "Sinatra's Spokesman," nor between "John Doe's Mouthpiece" and "Sinatra's Mouthpiece" (Tr. 119–20).

Dr. Buckhout also commented on some aspects of the data compiled by Dow's expert witness, Dr. Douglas Herrmann, whose testimony is discussed more fully below. One of Dr. Herrmann's studies asked respondents to rate their impressions of various categories of persons on a numerical scale of one to seven, a rating of one being "extremely negative," and seven "extremely positive." The list of categories was (from the most negatively rated to the most positively rated): thief, shyster, mouthpiece, politician, salesclerk, lawyer, mechanic, spokesman, custodian, and manager. Dr. Buckhout observed that the results of this Herrmann study were consistent with his findings, in that "mouthpiece" was ranked close to "shyster," a clearly pejorative appellation, while "spokesman" received a more positive rating, at the higher end of the rankings (Pl.Exs. 14A and 14B).

Dr. Buckhout also remarked upon a test that Dr. Herrmann administered to determine the extent to which Barron's readers recognized Rudin's name as having appeared in Barron's. The test presented four names of actual persons (Edward Garvey, Norman Belli, Barber Conable and Milton Rudin) to a sample of Barron's readers. The respondents were asked whether they recognized any of the named persons as having appeared in Barron's. Dr. Buckhout stated that if the respondents' answers to this question were purely a result of chance one would expect each of the four names to have been chosen as the correct answer by roughly 25% of the respondents. In fact, 50% of the respondents picked Rudin's name as the correct answer, a result which according to Dr. Buckhout strongly supported the conclusion that these readers actually remembered seeing Rudin's name in Barron's and had not simply made a correct guess by chance (Tr. 80–83).

Rudin's own testimony described his background and professional career, his relationship with Sinatra, his own understanding of and reaction to the Barron's caption, and the elements of damage he claimed to have suffered as a result of the publication of the caption. Rudin is a graduate of Harvard Law School, where he was a member of the board of editors of the law review. He is a member of the New York, California and District of Columbia bars. From 1949 until 1966 he was associated with the firm of Gang, Kopp, Rudin & Brown in Los Angeles, now (Gang, Tyre & Brown), where he was in charge of the litigation department and also practiced general law with emphasis on matters in the entertainment industry. In 1966 Rudin went into sole practice, and continued as a sole practitioner until 1982 when he and a colleague formed the firm of Rudin & Richman. During his career Rudin has served as attorney for numerous show business personalities, including (apart from Sinatra) Elizabeth Taylor, Richard Burton, Bob Hope, George Burns, Burt Lancaster, Lucille Ball, Liza Minelli, and others. Rudin has also represented companies such as Warner Communications and Desilu Productions. He has argued cases before the United States Supreme Court, and served for many years as a lawyer-delegate to the Ninth Circuit Judicial Conference as an appointee of Judge William C. Matthis, a United States District Judge for what is now the Central District of California, and for whom Rudin served as law clerk following his graduation from Harvard Law School. Rudin's charitable activities have included service as a member of the Board of Trustees of Reed College in Portland, Oregon, and the presidency and vice-presidency of the American Friends of Hebrew University in Jerusalem. Rudin is also a founder and director of the South Coast Foundation for the Developmentally Disabled, an organization engaged in fund raising and other activities for the promotion of research and study relating to traumatically brain-injured young adults (Tr. 124–132).

Rudin testified that upon reading the caption "Sinatra's Mouthpiece" printed over his letter to the editor he felt ridiculed and disparaged in his role as an attorney (Tr. 138–39). His sense of "personal humilia-

tion" on being referred to as Sinatra's mouthpiece, Rudin explained, was based upon his understanding of the slang meaning of "mouthpiece" as referring to a criminal lawyer without integrity. He felt the caption to be an attempt "to paint me in the [motion] pictures that I remembered as a kid with the mouthpiece as a fast talking guy with a derby who will do anything, he has got a bail bondsman in his pocket, a couple of judges in his other pocket and will do as his client pleases." (Tr. 140). Rudin testified that he considered the reference to him as a mouthpiece to injure his professional reputation because "I have worked very hard during my practice in California and in New York to gain a reputation of someone who was not pushed around, someone who acts with integrity ... and I feel that's something that attracts a lot of people to come to me for advice. ..." (Tr. 140–41).

On cross-examination Rudin stated that his relationship with Frank Sinatra is broader than his relationship with most other clients (Tr. 156). In addition to handling legal matters for Sinatra, Rudin books appearances for Sinatra, participates in joint business investments and ventures with him, and on occasion makes investments for Sinatra without prior consultation (Tr. 148–155). Rudin testified that at the time the Barron's article appeared approximately 30–40% of his time was devoted to handling Sinatra's affairs, and that in prior years this percentage had been as high as 60–75%.

## II.

### The Defendant's Evidence

Dow's evidence consisted of expert testimony by Dr. Douglas Herrmann, an associate professor of psychology at Hamilton College in Clinton, New York, and by Michael J. O'Neill, former Editor of the New York Daily News; fact testimony by Steven Anreder and Alan Abelson, editors of Barron's who were responsible for the article and caption which resulted in this action; dictionary entries defining "mouth-

piece;" and examples of the word's use in newspapers and other publications.

Dr. Herrmann's special areas of expertise include the field of psycholinguistics, and he is the author of numerous articles on the subject in leading scientific journals (Tr. 259; Def.Ex. H). To explore the validity of Dr. Buckhout's findings and to gather independent data on readers' perceptions of an individual referred to as a mouthpiece, Dr. Herrmann sent a questionnaire to a randomly selected sample of 500 Barron's readers (Def.Ex. K). Two hundred and twenty persons responded, and of this group Dr. Herrmann used the responses of the 134 respondents who followed the questionnaire instructions correctly.

The first part of Dr. Herrmann's questionnaire was designed to determine whether the dimensions used by Dr. Buckhout (e.g. "ethical/unethical") were perceived by the respondents as relevant to the meaning of "spokesman" and "mouthpiece." The questionnaire specified a list of ten "occupations" (thief, shyster, mouthpiece, politician, salesclerk, lawyer, mechanic, spokesman, custodian, and manager), together with nine sets of "dimensions" such as those used by Dr. Buckhout. The questionnaire asked the respondents to indicate, for each of the occupations, which (if any) of the nine sets of dimensions were properly "included in the definition of the occupation. Responses were tabulated in Defendant's Exhibit L, which shows the percentage of respondents who indicated that a particular dimension was part of the definition of a given occupation. The results established that only two of Dr. Buckhout's five dimensions were among the dimensions considered part of the definition of "mouthpiece" by at least 50% of the respondents, and that none of Dr. Buckhout's dimensions were among the dimensions with such a 50% rating as to the definition of "spokesman."

The questionnaire also contained two sets of questions designed to explore the respondents' perceptions of the connotative [5]

---

**5.** Dr. Herrmann defined the "denotative" meaning of a word as "that which a concept ... refers to in the world," and the "connotative" meaning as referring to a person's emotive re-

meaning of "mouthpiece." The first set of questions (described above in connection with Dr. Buckhout's testimony) contained the same list of "occupations" used in the first Herrmann study, and asked the respondents to rate the occupations on a scale of one to seven, a rating of one being "extremely negative," four being "neutral," and seven "extremely positive." Dr. Herrmann noted that the answers to his questions established that the mean rating for "mouthpiece" was 2.57, and he therefore concluded that the study showed "mouthpiece" to be a "somewhat negative term" (Tr. 279; see Pl.Ex. 14A). Herrmann's second set of questions asked for an evaluation of four of the same "occupations" (mouthpiece, spokesman, shyster, custodian), this time paired with five different persons (Frank Sinatra, Walter Cronkite, Pope John Paul, President Nixon, and Charles Manson). For example, the respondents were asked to evaluate "Pope John Paul's Mouthpiece," "Pope John Paul's Spokesman," "Pope John Paul's Shyster," and "Pope John Paul's Custodian" on a scale of one to seven, and so on for each of the five persons and four occupations listed above. Dr. Herrmann drew several conclusions based upon the results of this study as compared to the results of the study evaluating the occupations in isolation. First, he noted that the mean rating of the word "mouthpiece" in isolation was 2.57, while the mean rating of "Frank Sinatra's Mouthpiece" was 2.88, a somewhat less negative rating. This result indicated to Dr. Herrmann that pairing the term "mouthpiece" with Sinatra's name did not bring out or amplify whatever negative connotations the word may have had (Tr. 284).

Dr. Herrmann also noted that there was a difference of approximately two units between the mean ratings of "spokesman" and "mouthpiece" when evaluated in isolation (4.5 for "spokesman" and 2.57 for "mouthpiece;" see Pl.Ex. 14A), while the difference in the mean ratings for "Frank Sinatra's Spokesman" and "Frank Sinatra's Mouthpiece" was approximately one unit

(3.82 for "Sinatra's Spokesman" and 2.88 for "Sinatra's Mouthpiece;" see Pl.Ex. 15A). According to Dr. Herrmann, this narrowing of the difference between the ratings of the two words, which occurred when the words were coupled with Sinatra's name, was a "significant pattern" which indicated that whatever difference may exist between the connotations of the two words becomes less salient when the words are used in conjunction with Sinatra's name. Dr. Herrmann also testified that, contrary to Dr. Buckhout's conclusions, the results of Dr. Buckhout's studies showed a similar statistically significant result when proper statistical techniques were applied in evaluating Dr. Buckhout's data (Tr. 285–86).

Dow also presented expert testimony by Michael J. O'Neill, a prominent journalist, in support of its position that the use of the caption "Sinatra's Mouthpiece" was consistent with principles of responsible journalism. O'Neill, who is currently writing a book and lecturing to various universities, was a long-time correspondent for United Press International and subsequently joined the staff of the New York Daily News. O'Neill's career with the Daily News culminated with his service as Editor, the principal editorial position at the newspaper. O'Neill is a member and the immediate past president of the American Society of Newspaper Editors.

O'Neill testified that the substantial investment by Sinatra, Rudin and three others in the Great Lakes Dredge & Dock Company was indisputably a newsworthy event—in O'Neill's words, "a natural" (Tr. 239). O'Neill stated that in his opinion Barron's use of the caption "Sinatra's Mouthpiece" was entirely consistent with commonly accepted principles of professional journalism (Tr. 241). According to O'Neill, any editor would "automatically" have used Sinatra's name in the caption because "it is the Sinatra angle here that is . . . the interesting point about it all," and

action to the word. Dr. Herrmann testified that studies such as his and Dr. Buckhout's were useful in determining only the connotative meaning of words (Tr. 262–63).

because the purpose of a caption is to attract the reader's attention so that the text which follows will be read (Tr. 241). Use of the caption "Sinatra's Mouthpiece" was then a logical step, O'Neill stated, because it was necessary to identify the relationship of the writer to the catchword "Sinatra" (Tr. 242). According to O'Neill "mouthpiece" was an acceptable word. He denied that the term inevitably suggested a lawyer in sympathy with the underworld (Tr. 242, 254). In his view, the fact that "mouthpiece" may be used in a legal context as a derogatory term is not necessarily relevant in determining whether journalists writing for the general public may appropriately use the word (Tr. 243).[6]

### III.

The issue for trial framed by this Court's earlier decision was whether, in view of the fact that the caption "Sinatra's Mouthpiece" is susceptible of a defamatory meaning, "that was the sense in which the words were likely to be understood by the ordinary and average reader." *Mencher v. Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257, 259 (1947), *quoted in James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976).[7]

Having considered all the evidence presented by the parties we find that Rudin has not sustained his burden of establishing that the defamatory meaning he ascribes to "Sinatra's Mouthpiece" is likely to have been the meaning understood by the average Barron's reader.

█ The studies performed by Drs. Buckhout and Herrmann, though intriguing as examples of psycholinguistic research, provide ambiguous evidence at best on the question whether Barron's readers were likely to have perceived the disputed caption as a defamatory reference to Rudin. Dr. Buckhout's and Dr. Herrmann's studies both lend support to the conclusion that "mouthpiece" is generally perceived as a somewhat negative term, and certainly as a more negative term than "spokesman" (Pl. Exs. 12, 14A, 14B). The studies thus lend some support to Rudin's position in that they tend to discredit Dow's assertion that "mouthpiece" is regarded as nothing but a synonym for "spokesman." To prevail in a defamation action, however, it is necessary to demonstrate not only that the term applied to the plaintiff was more negatively regarded than a possible alternative, but also that the word actually used was understood by the reader in the defamatory sense alleged by the plaintiff. The studies shed

6. Steven Anreder and Alan Abelson, the Associate Editor and Editor (respectively) of Barron's, also testified. Because their testimony was not directly relevant to the question whether the caption was perceived by Barron's readers as defamatory, their testimony is not discussed in detail in this opinion. In essence, Anreder and Abelson testified that Barron's attempts to use a substantially more lively, irreverent and witty literary style than most financial publications (Tr. 329, 377). Anreder, who wrote the original article describing the investment of Sinatra *et al.* in Great Lakes Dredge & Dock Company as well as the caption "Sinatra's Mouthpiece," testified that he made the decision to print Rudin's letter to the editor late on Friday night when a need arose for additional "Mailbag" material as the week's edition was being prepared. He showed the letter to Abelson, who agreed with Anreder that the letter should be printed (without the last two paragraphs which Anreder felt were "embarrassing" to Rudin) and told the copy editor "why don't we slug it 'Sinatra's Mouthpiece?'" (Tr. 336). Anreder stated that he used the word "mouthpiece" because it was his

impression from the letter that Rudin was acting as Sinatra's spokesman in writing the letter and that he chose "mouthpiece" rather than "spokesman" because he considered the term more "colorful" and more likely to draw attention to the letter. Anreder denied any intention of ridiculing Rudin by the caption "Sinatra's Mouthpiece" (Tr. 338–340). Abelson, too, testified that he considered the use of the caption to be appropriate in the circumstances and that it did not reflect an attempt to disparage Rudin (Tr. 383–389).

7. Rudin cites *Ben-Oliel v. The Press Publishing Co.,* 251 N.Y. 250, 167 N.E. 432 (1929), for the proposition that defamation can be established if even a small number of readers understand the words at issue in a defamatory sense. More recent opinions of New York courts, however, appear to have adopted the standard cited above as governing law. *See,* in addition to cases cited in the text immediately above, *Everett v. Gross,* 22 A.D.2d 257, 258, 254 N.Y.S.2d 561, 563 (1st Dep't 1964).

little light on this question. Furthermore, Dr. Herrmann's material does suggest that whatever difference is perceived between the words "mouthpiece" and "spokesman" in the abstract is significantly narrowed when the comparison is between "Sinatra's Mouthpiece" and "Sinatra's Spokesman." This fact casts doubt on the proposition that the potential defamatory connotations of "mouthpiece" alone were responsible for any negative impression that Barron's readers might have formed of Rudin as a result of the caption.

■ Our earlier opinion suggested that one of the theories Rudin was entitled to pursue at trial in proving his defamation claim was that Sinatra himself, however unfairly, is associated in the public mind with the underworld, and that the caption was defamatory because it allegedly exploited the association by use of the word "mouthpiece." Rudin did not seriously pursue this theory at trial, however. Indeed, Rudin's expert witness, Dr. Buckhout, stressed that the difference he found in people's perceptions of "mouthpiece" and of "spokesman" were not (contrary to Dr. Herrmann's assertions) significantly affected by whether the mouthpiece or spokesman was Sinatra's or "John Doe's." [8] Although Rudin in the course of his own testimony speculated that the Barron's caption represented an allusion to purported organized crime associations popularly attributed to Sinatra, Rudin presented no evidence on the extent to which Barron's readers may have subscribed to this view.[9]

The testimony of Judge Kauffman, Peter Fleming and Paul Curran, in contrast to the psycholinguistic studies, provided direct evidence that the defamatory meaning of "mouthpiece" identified by Rudin is shared at least by them and other members of the legal community. These witnesses conceded, however, that the word does not invariably convey a defamatory meaning, but that its meaning can depend upon the context in which it appears.[10] Even so, Dow overstates its case by arguing that the meaning attributed to the word "mouthpiece" by these attorneys is a perception necessarily confined to the legal profession and is irrelevant to the question of how the average Barron's reader probably understood the phrase "Sinatra's Mouthpiece." Nevertheless, two factors lead us to conclude that this testimony is insufficient to establish Rudin's claim. First, these witnesses attributed a defamatory meaning to the word only when it is used of a lawyer. Rudin is not identified as a lawyer in his letter to the editor, and whether readers were likely to recall that Rudin was identified as a lawyer in the article that had appeared two months earlier is open to doubt. Second, although the attorneys' testimony is not wholly irrelevant to the question of how Barron's readers viewed the

---

8. Dr. Herrmann testified, however, and the plaintiff did not dispute, that at least under one appropriate statistical procedure Dr. Buckhout's results did show a statistically significant narrowing of the difference in people's perceptions of "mouthpiece" and "spokesman" when Sinatra's name was used rather than "John Doe's" (Tr. 285–86).

9. On cross-examination of Dr. Herrmann, Rudin's counsel brought out the fact that in a pilot study using college students that Dr. Herrmann had run prior to sending out his questionnaire, the "modal response" (*i.e.*, the response most frequently given) by male students when asked for their associations with the term "Sinatra's Mouthpiece" was "Mafia." (Tr. 318–19; Pl.Ex. 17). The extent to which the answers of this small group of male college students can be generalized to apply to Barron's readers, however, is purely speculative.

10. For example, Paul Curran testified as follows:

"Q. Is it your understanding that the word mouthpiece always means a lawyer who may be connected with unsavory elements in the population?
A. No.
Q. And it may mean something else in a different context?
A. You mean talking about somebody other than a lawyer?
Q. Any other context.
A. Yes."

(Tr. 176). Judge Kauffman also testified that he believed there were situations in which "mouthpiece" would not be a defamatory term, although he stated that when the word is used of an attorney such situations would be "the exception rather than the rule." (Tr. 28).

caption, standing alone their testimony cannot be viewed as persuasively establishing that Barron's readers were unlikely to have understood the word in the innocent sense of "spokesman" advanced by Dow, even if the readers could be assumed to have realized that Rudin was a lawyer.

Both parties submitted dictionary definitions of the word "mouthpiece," along with examples of the word's use in newspaper articles and other publications (Pl.Exs. 6, 18; Def.Exs. O, G). This evidence is inconclusive at best. As Dow points out, although many dictionaries and synonym finders list "criminal lawyer" as a slang meaning of "mouthpiece" (*e.g.*, Webster, *New Collegiate Dictionary* (1981)), none of the entries presented by Rudin (including those from slang dictionaries) gives the definition Rudin ascribes to the term—namely, a lawyer associated with the underworld.[11] The primary meaning given by every standard dictionary (apart from definitions referring to "mouthpiece" as a part of a musical instrument) is the meaning advanced by Dow—*i.e.*, one who expresses another's views. *See* Def.Ex. O (listing dictionary entries). While dictionary definitions are not controlling in a defamation action, certainly the dictionary evidence does not weigh more heavily in favor of Rudin's position than against it.

The same observation may be made of the voluminous examples of articles using the term "mouthpiece" which the parties have put in evidence (Pl.Ex. 6; Def.Ex. O). Rudin's own examples establish that "mouthpiece" is used in a broad variety of contexts and that its meanings and connotations depend upon the context in which the term is used. Even when used of a

lawyer, the term does not invariably carry underworld connotations. One article in The Washington Post, for example, describes a lawyer specializing in intellectual property cases who litigated against Parker Brothers in a case involving a board game, and reports the lawyer's description of himself as "one underpaid, understaffed but dedicated lawyer against battalions of Parker Bros. mouthpieces earning astronomical fees" ("Maverick Man of Ideas," The Washington Post, April 17, 1977, p. B1). Similarly, another Washington Post article used the headline "Scribes, Mouthpieces Draw Sevareid's Ire" for an article reporting on television news correspondent Eric Sevareid's comments criticizing Washington, D.C. for its overabundance of reporters and lawyers (Washington Post Magazine, August 17, 1980, p. 2). Other articles submitted by Rudin refer to F. Lee Bailey and to Margaret Trudeau's lawyer, Steve Martindale, as "mouthpieces" ("But hurry—postal rates go up next month," United Press International, October 21, 1981; "A Low-profile Approach to the Media by High-profile Maggie & Mouthpiece," Washington Post Magazine, May 20, 1979, p. 4). While these articles leave one with the general impression that using the word "mouthpiece" of an attorney conveys at least an irreverent attitude toward the attorney, whether the overall sense conveyed is pejorative rather than simply irreverent seems to depend mainly upon the context in which the word appears. Thus, these articles add little support to the claim that the use of "mouthpiece" in this caption is likely to have been understood in a defamatory sense by the average reader of Barron's.

---

**11.** In our earlier opinion we noted that at least one slang dictionary listed "mouthpiece" as synonymous with "a lawyer in sympathy with the underworld" and "an unscrupulous criminal lawyer." *The American Thesaurus of Slang* (Thomas Y. Crowell Co., 1942). This interpretation of the entry that appears in that reference work was incorrect. *The American Thesaurus of Slang* provides the following listing of slang synonyms for "criminal lawyer:"

"Ambassador, black box, connection, doctor fix, fat-mouth, fixer, front, fronter, front man, healer, lip, mender, mole, mouth,

mouthpiece, tongue, voice. *Spec.* right lip, *a lawyer in sympathy with the underworld;* shyster lip, *an unscrupulous criminal lawyer.*" (Italics original.)

The italicized phrases are not part of the general list of synonyms in which "mouthpiece" appears, but instead are definitions of the terms "right lip" and "shyster lip." Thus, Dow is correct in pointing out that Rudin has presented no lexicographical works that directly confirm his view of the meaning of "mouthpiece" when applied to an attorney.

In sum, while we do not in any way discount Rudin's sincerity in describing his reaction to the caption, nor his conviction that the word "mouthpiece" has a precise and inevitably defamatory meaning when applied to an attorney, we are unable to conclude that the weight of the evidence establishes that Barron's use of the caption "Sinatra's Mouthpiece" was defamatory in the circumstances of the case. It may be added that, in view of Rudin's distinguished record, his many accomplishments, and the respect that he commands in the legal profession as witnessed by the eminent attorneys who testified in his behalf, Rudin's reputation in the legal profession is plainly secure even if the caption chosen by Barron's were to be regarded as gratuitous or in poor taste.

Dow has argued that, even if the caption were defamatory, Rudin would not be entitled to prevail because the relationship between Rudin and Sinatra is a matter "arguably within the sphere of legitimate public concern," *Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569, 571 (1975), and Rudin is therefore required to show that Barron's acted in "a grossly irresponsible manner" in using the caption, a conclusion Dow contends is not supported by the evidence. *Id.* at 38 N.Y.2d 199, 379 N.Y.S.2d 64, 341 N.E.2d 571. Dow further contends that the proof at trial contained no evidence of "actual injury" to Rudin's reputation resulting from publication of the caption, and that he would therefore be barred from recovering damages for his emotional anguish and humiliation alone even if the caption were found to be defamatory. *See France v. St. Clare's Hospital and Health Center,* 82 A.D.2d 1, 441 N.Y.S.2d 79 (1st Dep't.1981); *Salomone v. MacMillan Publishing Co., Inc.,* 77 A.D.2d 501, 429 N.Y.S.2d 441 (1st Dep't. 1980); *Silberman v. Georges,* App.Div., 456 N.Y.S.2d 395 (1st Dep't.1982). These arguments, which have been ably briefed by the parties, raise significant questions as to the proper interpretation of New York defamation law. In light of the disposition reached here, however, it is neither necessary nor appropriate for us to address them.

This opinion constitutes the Court's findings of fact and conclusions of law. For the reasons stated above, we find in favor of the defendant and accordingly dismiss the complaint.

It is so ordered.