RAMADA INNS, INC., Hotel Ramada of Nevada, Admar of New Jersey, Inc. and Ramada Hotel Operation Company, Plaintiffs,

v.

DOW JONES & COMPANY, INC., Defendant.

Civ. A. No. 83C–AU–56.

Superior Court of Delaware, New Castle County.

Submitted: July 8, 1987.
Decided: Sept. 30, 1987.
On Motion to Modify: Feb. 8, 1988.
On Application to Reconsider:
Feb. 8, 1988.

F. Alton Tybout, and Nancy Chrissinger, of Tybout, Redfearn, Casarino & Pell, Wilmington, and Thomas C. Green, and Dorie S. Finnerman, of Sharp, Green & Lankford, Washington, D.C., of counsel, for plaintiffs.

Edmund N. Carpenter, II, and John A. Parkins, Jr., of Richards, Layton & Finger, Wilmington, and Gregory L. Diskant, and Susan E. Weiner, of Patterson, Belknap, Webb & Tyler, New York City, and Robert S. Warren, of Gibson, Dunn & Crutcher, Los Angeles, Cal., of counsel, for defendant.

POPPITI, Judge.

This is an action for libel, negligence and injurious falsehood brought by the plaintiffs (collectively "Ramada") against defendant Dow Jones & Company, Inc. ("Dow Jones"), publisher of *The Wall Street Journal* ("the *Journal*"). Both Ramada and Dow Jones are Delaware corporations. Ramada seeks to recover for the alleged damage to its reputation arising from the publication of two articles. In addition Ramada seeks to recover the following special damages: (1) $100,000.00 expended by Ramada in connection with inquiries from state casino licensing officials; (2) $100,000.00 in additional internal costs to Ramada caused by the *Journal* articles; and (3) $3,879,725.00 expended by Ramada to settle the shareholder litigation, of which $1,300,000.00 went to pay its attorneys' fees. Finally Ramada seeks to recover punitive damages.

Dow Jones has moved for summary judgment in its favor as to all of Ramada's claims. The Court's decision is based on extensive briefing, oral argument held on June 9, 1987, and supplemental memoranda filed after oral argument.

Ramada's claims stem from two articles appearing in the *Journal* in 1981 which discuss Ramada's entry into the business of casino gambling, both in Las Vegas and Atlantic City. The first article, dated August 17, 1981 entitled "Ramada Inns' Gambling Operations Beset by Thefts and Mounting Costs" ("Ramada's Gambling Operations") was coauthored by *Journal* staff reporters Jim Drinkhall and John Andrews.[1] The second article, dated August 20, 1981 entitled "Ramada Inns Inc. Chairman Isbell Quits; Phoenix Attorney Is Chosen As Successor" ("Isbell Quits"), was written in part by Jim Drinkhall ("Drinkhall").[2] Ramada's claims with respect to the "Isbell Quits" article relate to that portion of the article which discusses Ramada's response to "Ramada's Gambling Operations."

Following publication of the articles, several shareholder suits were brought

---

1. This article appears in full text in Appendix "A" to this opinion. The underlined portions of the article represent those statements which Ramada contends are false and defamatory.

2. This article appears in full text in Appendix "B" to this opinion. The underlined portions of the article represent those statements which Ramada contends are false and defamatory.

against Ramada. The first such suit was filed on August 21, 1981 and was ultimately settled.

This action was originally commenced against Dow Jones and its reporters John Andrews ("Andrews") and Drinkhall. The action against the two reporters was subsequently dismissed for lack of personal jurisdiction. Ramada contends that Dow Jones is liable in its own right under two theories, namely, for alleged deficient supervision of Andrews and Drinkhall amounting to a reckless disregard for the truth, and for conduct of its reporters based upon the principle of vicarious liability.

On summary judgment the "evidence of the nonmovant [Ramada] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Gannett Co., Inc. v. Re,* Del.Supr., 496 A.2d 553 (1985). A motion for summary judgment therefore may be granted to a party only if, after a consideration of the evidence in the light most favorable to the nonmoving party the movant is entitled to judgment as a matter of law and no material facts are in dispute. *Moore v. Sizemore,* Del.Super., 405 A.2d 679 (1979).

In December, 1979, Ramada acquired the Tropicana hotel-casino in Las Vegas. In February, 1980, Ramada decided to go forward with plans to build a new Tropicana hotel-casino in Atlantic City. The challenged portions of the Ramada articles advise the reader in substance as follows:

(1) The Las Vegas Tropicana has lost more than $30 million to employee thefts —$20 million stolen through various schemes, and $11 million in uncollectible gambling markers apparently stemming from phony credit documents;

(2) Ramada was sued for mismanagement by the previous owners of the Las Vegas Tropicana;

(3) According to a New Jersey gambling official the alleged thefts at the Las Ve-

gas Tropicana could cause problems for Ramada in receiving a license to operate in Atlantic City; and

(4) Ramada would not comment on several of the difficulties which the articles stated Ramada was experiencing.

While Dow Jones does not dispute the objective falsity of the challenged statements, it denies the defamatory nature of the statements contending that each of the challenged statements are subject to one or more of the following defenses:

(1) substantial truth;

(2) the statement is not defamatory as a matter of law;

(3) the statement constitutes protected opinion, and is not a statement of fact;

(4) Ramada is libel-proof as to the statement;

(5) Ramada has impliedly consented to the statement.[3]

This opinion shall treat the Defamation claims in Section I, the Negligence claims in Section II, the Injurious Falsehood claims in Section III, and the issue of Damages in Section IV.

## I. DEFAMATION

■■■ In defense of Ramada's defamation claims Dow Jones relies primarily on the doctrine of "substantial truth." According to Delaware law a publisher is not liable for defamation when the statements attributable to the publisher are determined to be substantially true. *Riley v. Moyed,* Del.Supr., 529 A.2d 248 (1987); *Gannett Co., Inc. v. Re,* supra. "If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Riley,* at 253, *citing Gannett Co., Inc.,* at 557. In evaluating whether a statement is substantially true, the Court must consider whether the "gist" or "sting" of the statement is true. *Id.* The gist or sting of the statement is true " 'if it produces the same effect on the

---

**3.** Defenses four and five were both raised by Dow Jones in its brief, however I do not address these defenses in my opinion because the challenged statements to which they apply are disposed of on other grounds. *See* pp. 325, 327 & 327–28 to this opinion.

mind of the recipient which the precise truth would have produced.' " *Riley*, at 253, *quoting Williams v. WCAU–TV*, E.D. Pa., 555 F.Supp. 198, 202 (1983).

The substantial truth analysis necessarily contemplates a comparison of the effect of the alleged libel versus the effect of the precise truth on the mind of the recipient or average reader. The parties agree that the phrase "average reader" refers to the average reader of the publication containing the alleged libel, here the average reader of the *Journal. See Rudin v. Dow Jones & Co., Inc.*, S.D. N.Y., 557 F.Supp. 535 (1983) (decision after nonjury trial). In this case the *Journal* is a publication which appeals primarily to the business and financial community. It can reasonably be expected therefore that its readers are somewhat more familiar with the various factors which are damaging to the reputation and vitality of a public corporation, than would be the average reader of a general daily newspaper. *Cf., Rudin v. Dow Jones & Co., Inc.*, S.D.N.Y., 510 F.Supp. 210, 215 (1981).

Before testing the substantial truth of individual statements contained in the articles, it becomes necessary to resolve the following questions of law: (1) whether the burden of proof is on the defendant to demonstrate substantial truth, or whether the burden is on the plaintiffs to negate that the statements are substantially true; and (2) what is the standard of proof applicable to the issue of substantial truth—preponderance of the evidence or clear and convincing evidence.

With the Supreme Court's decision in *Philadelphia Newspapers, Inc. v. Hepps*, 106 S.Ct. 1558, it is clear that the public figure plaintiff in a defamation action is constitutionally required to bear the burden of proving falsity. This requirement is binding upon this Court by virtue of the First Amendment to the United States Constitution which is made applicable to the States by the Fourteenth Amendment. *See Ross v. News–Journal Company*, Del.Supr., 228 A.2d 531, 532 (1967). Dow Jones contends that this requirement of proving falsity necessarily entails the burden of negating substantial truth. For the following reasons, I agree.

At common law it was well settled that truth was an affirmative defense to be raised by the defendant, and for which the defendant had the burden of proof. Restatement, Second, Torts § 581A comment b. (1977); *Cf., Delaware F. & M. Ins. Co. v. Croasdale*, Del.Super., 11 Del. (6 Houst.) 181 (1880). In establishing the truth of the challenged statements, the common law required only that the defendant establish the substantial truth. As stated in the Restatement, Second, Torts § 581A comment f. (1977):

> [i]t is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.

*See Gannett Co., Inc. v. Re*, 496 A.2d at 557 (establishing the test of substantial truth in Delaware).

In light of *Hepps*, the question becomes does the constitutionally imposed burden of proving falsity also require plaintiffs to also negate the "substantial truth" of the challenged statements.

While this issue was not directly addressed in *Hepps*, I am satisfied that the burden of proving falsity necessarily incorporates the burden of negating the substantial truth. Since truth, for the purposes of a defamation action, is measured in terms of "substantial" truth, *Gannett Co., Inc. v. Re*, 496 A.2d at 557, as opposed to the "literal" truth, Restatement, Second, Torts § 581A comment f. (1977), *ipso facto*, the proof of falsity must go beyond establishing "literal" falsity, and must negate the substantial truth of the challenged statement. After all, a statement which is "substantially" true within the context of a defamation action is considered a true statement, and would relieve the defendant of liability for defamation. *Riley v. Moyed*, supra. Likewise, since false statements are actionable and substantially true statements are not actionable as a matter of law, substantially true statements, which are statements that are "literally" false, are statements that are *not* "false"

for purposes of a defamation action. Accordingly, the burden of proving falsity, which the *Hepps* Court has placed on the plaintiffs, must in my view necessarily entail the burden of negating the substantial truth of the statement.

This analysis is, in my view, consistent with the rationale underlying the Supreme Court's decision in *Hepps* to place the burden of proving falsity on the plaintiff. The *Hepps* majority was concerned with the "chilling" effect on the defendant, who publishes speech of public concern, that would result from a state law that placed the burden of proving truth upon the defendant. *Hepps,* 106 S.Ct. at 1564–65. To limit a plaintiff's burden to establishing the "literal" falsity of the alleged libel, and to require a defendant to establish the substantial truth, would in my view similarly serve to deter defendants from publishing speech of public concern "because of the fear that liability will unjustifiably result," *Id., citing New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), thereby producing the "chilling" effect which the *Hepps* Court was intent on avoiding.

Having determined that Ramada's burden of proving falsity includes the burden of negating substantial truth, the question becomes what is the standard of proof necessary for plaintiffs to prove falsity (or negate substantial truth).

■ In order to prevail on a libel claim, a public figure plaintiff, such as Ramada, must prove both falsity (negate substantial truth), *Philadelphia Newspapers Inc. v. Hepps,* 106 S.Ct. at 1562, and actual malice —knowledge of falsity or reckless disregard of the truth. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *New York Times v. Sullivan,* 376 U.S. at 285–86, 84 S.Ct. at 728–29. The Supreme Court has repeatedly held that the element of malice must be proven with "convincing clarity", *New York Times v. Sullivan,* 376 U.S. at 285, 84 S.Ct. at 729, or by "clear and convincing" evidence. *Rosenbloom v.*

*Metromedia,* 403 U.S. 29, 30, 91 S.Ct. 1811, 1813, 29 L.Ed.2d 296 (1971). The quantum of proof with respect to falsity, however, has never been directly addressed by the Supreme Court.

In *Rosenbloom v. Metromedia,* supra, at 50, 91 S.Ct. at 1823, the Supreme Court expressly rejected the preponderance of the evidence standard, in favor of the clear and convincing standard, as being inconsistent with the First Amendment. The Court, in discussing the importance of a more stringent standard for libel cases, concludes that an erroneous verdict for the plaintiff would be much more serious than one for the defendant. The possibility of such error, the Court noted, would "create a strong impetus toward self-censorship ...", producing the result that legitimate utterances would be deterred. *Id.* Consistent with this analysis courts have repeatedly held that the burden of proving falsity of an alleged libel must be with "convincing clarity." *See, e.g., Steaks Unlimited, Inc. v. Deaner,* 3rd Cir., 623 F.2d 264, 272 (1980); *Buckley v. Littell,* 2nd Cir., 539 F.2d 882, 889 (1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *Nevada Independent Broadcasting Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337, 343 n. 5 (1983); *Whitmore v. Kansas City Star Co.,* Mo.Ct.App., 499 S.W.2d 45, 52 (1973).

While Ramada correctly points out that in *Riley v. Moyed,* supra, the Delaware Supreme Court did not apply a "clear and convincing" standard to the issue of falsity, Ramada failed to note that the reason the Court did not apply this standard was because the alleged statements were found nondefamatory, *Id.* at p. 250, and therefore the issue of which standard of proof to apply was never addressed. Accordingly, contrary to the assertions of Ramada, no Delaware court has adopted a position contrary to the authority cited herein.

■ I conclude, therefore, that Ramada must present clear and convincing evidence as to the falsity or negate the substantial truth of the *Journal* articles. *See Anderson v. Liberty Lobby, Inc.,* 106 S.Ct.

at 2514 (1986); *Philadelphia Newspapers, Inc. v. Hepps,* 106 S.Ct. at 1563–64.

I now turn to the individual statements contained in the *Journal* articles regarding Ramada's Las Vegas Tropicana. I will refer to specific paragraphs of each article by number, in the manner set forth in Appendices "A" and "B" to this opinion.

### A. The August 17, 1981 "Ramada Gambling Operations" article,

*Paragraphs 3, 8, 11, and 12:*

■ Dow Jones argues that the *Journal's* report of theft and skimming by Ramada employees at the Las Vegas operation, found at paragraphs 3, 8, 11 and 12 of the August 17th article, is substantially true.

Philip Manual, an investigator hired by Ramada, compiled his findings into three confidential internal reports ("Manual Reports") dated May 11, 1981, June 24, 1981, and July 8, 1981. Drinkhall, the *Journal* reporter who wrote 13 of the 14 paragraphs contained in "Ramada's Gambling Operations" which are alleged to be defamatory, attributes the figures on employee theft and skimming to conversations with Philip Manual. Manual denies having provided Drinkhall with such specific information, but does admit telling Drinkhall that Ramada's Las Vegas hotel-casino was subject to "vulnerabilities." On summary judgment the Court must accept this version of the facts as true.

The *Journal* reporters did not have access to the Manual Reports before the articles in question were published. However, Dow Jones, in support of its substantial truth "defense",[4] points to the contents of the Manual Reports as the measure of the "precise truth." I am satisfied that the August 17th article's report of $30 million in losses (paragraph 11 states about $20 million attributable to theft and roughly $11 million attributable to uncollectible gambling markers), was clearly conveyed to the average reader of the *Journal* as a

report of the findings of Mr. Manual's "audit." Accordingly, the test in my view is whether the challenged statements constitute a substantially truthful account of Manual's findings.

As to the amount of employee theft at the Las Vegas Tropicana, the May 11, 1981 Manual Report states the following:

[o]ur limited review and observations have caused us to believe that some scheme of theft or skimming does exist at the Tropicana. This belief is based in part on statistical information discussed under Section VII, Casino Revenues. During the calendar year 1980, gross handle totaled $281,365,624 in which the hold totaled $48,948,649 or a percentage of 17.4. There was a trend downward for the first three months of 1981 with a total handle of $85,524,947 and a hold of $13,362,242 for a percentage of 15.6. It is recognized that the percentage for 1981 only covers three months and may level out over the next nine months. We must keep in mind, however, that experts have advised us that in well managed casinos the overall hold should be up to 22%. This means that the overall potential loss of revenue for 15 months of operation caould [sic] sum as high as 18.3 million. This computation is based on the assumption that the total handle has been reported. If not the potential loss would increase in perportion [sic] by that amount that does not enter the records. As exhibited by the above computation even a small percentage drop means a large revenue loss because of the high volume of handle.

For purposes of the substantial truth analysis, I accept the foregoing as being the precise truth. Manual, utilizing a statistical analysis comparing the actual hold percentage at the Tropicana during Ramada's first 15 months of ownership with a hold percentage considered by experts to be representative of a well-managed casino, concluded that the "potential loss of reve-

---

4. While the burden is on Ramada to negate Dow Jones' allegation of substantial truth so that substantial truth is not an affirmative defense, should Ramada fail to negate substantial truth

of the challenged statements by clear and convincing evidence, such failure would operate in favor of Dow Jones as a successful defense to Ramada's defamation claims.

nue for 15 months of operation could run as high as 18.3 million." This is to be compared to the article's statement that "Mr. Manual's audit apparently found that about $20 million of casino revenue had been stolen through various schemes."

The readily apparent difference between the statements is that the Manual Report qualifies the loss as a "potential" loss based upon statistical analysis, whereas the article at paragraph 11 indicates that Manual "apparently" found that $20 million "had been stolen." The article speaks in terms of actual loss compared to the Manual Report's finding of potential loss based upon statistical analysis.

To negate the allegation of substantial truth Ramada must demonstrate that the precise truth ($18.3 million in potential losses based upon statistical analysis) as opposed to what was actually reported by the *Journal* ($20 million in actual losses due to employee theft), would have been more damaging to its reputation in the mind of the average reader of the *Journal.* I am satisfied that it is reasonable to assume that the average reader of a major financial newspaper such as the *Journal* would be attuned to the distinction between a report of actual loss and a report of potential loss. Not only is the report of a potential loss far more speculative than the report of actual loss, but the existence of potential loss does not arouse the average reader's concern with Ramada's compliance with public reporting requirements, *see generally,* 69 Am.Jur.2d, Securities Regulation–Federal, § 230, 233, as does the report of actual loss.

Based on the foregoing considerations, I am satisfied that a reasonable juror could conclude that the alleged libel was more damaging in the mind of the average reader of the *Journal* than would have been a precisely truthful report of Manual's findings.

Accordingly, summary judgment is HEREBY DENIED with respect to Dow Jones' contention that the article's report of $20 million in employee theft is "substantially true."

With respect to the article's statement, at paragraph 11, that roughly $11 million in gambling markers are "apparently uncollectible because of phony credit documents", Manual denies having provided Drinkhall with this information. On summary judgment the Court must accept this version of the facts as true. However, Dow Jones contends that its report of $11 million in uncollectible gambling markers, is a substantially truthful account of Manual's findings.

A precisely truthful account of the Manual Reports would have indicated the following:

(1) lack of good credit practices has caused "what we [the Manual Group] believe to be heavy losses especially in connection with players on Mexican junkets."

(2) it appears that only 15% of the markers [owed by Mexican junket players] have been collected and 63% of the total markers are in violation of the [junket] contract.

(3) over $105,000 in Mexican markers were written off in one month and attributed by Ramada to either bad debt or customer fraud.

The Manual Reports do not contain any reference to $11 million in uncollectible gambling markers.

Again, the test of substantial truth is whether the alleged libel is more damaging in the mind of the average reader of the *Journal* than would have been a precisely truthful account of Manual's findings. Dow Jones contends that the difference in the amount of confirmed loss due to uncollectible markers is not important. The "gist" or "sting" of the article, according to Dow Jones, is that due to poor credit practices Ramada sustained heavy losses attributable to uncollectible gambling markers.

While the average reader of a general newspaper may focus on the fact that Ramada was experiencing losses due to poor credit practices, and may not be effected differently by the amount of loss reported, *see Weisburgh v. Mahady,* 147 Vt. 70, 511 A.2d 304, 306 (1986); *Dudley v. Farmers*

*Branch Daily Times,* Tex.Civ.App., 550 S.W.2d 99, 100 (1977); and *McCracken v. Evening News Ass'n,* 3 Mich.App. 32, 141 N.W.2d 694, 698 (1966), I am satisfied that the same cannot be said as a matter of law about the average reader of the *Journal,* who may be more aware of and more aroused by the reporting of an $11 million uncollectible debt as opposed to the much more general language of the Manual report.

Based on the foregoing, I am satisfied that a reasonable juror could conclude that the alleged libel, confirmed losses of $11 million, was more damaging in the mind of the average reader of the *Journal* than would have been a precisely truthful report of Manual's findings, i.e., losses of $100,000.

Accordingly, summary judgment is HEREBY DENIED with respect to Dow Jones' contention that the article's report of more than $30 million in losses (about $20 million attributable to employee theft and roughly $11 million attributable to uncollectible gambling markers) is substantially true.

■ In contrast to the article's report of over $30 million of losses attributable to employee theft and uncollectible markers, the allegation in Paragraph 12 that "about $200,000" was lost in rigged card games engineered by insiders, is, in my view, substantially true as a matter of law. Ramada's only objection to this statement is that the actual loss due to rigged card games was closer to $100,000, and that despite having this information Drinkhall nevertheless printed the inflated $200,000 figure. Even to the average reader of the *Journal* the report of $200,000 lost in rigged card games (the alleged libel) would, in my view, be no more damaging to Ramada's reputation than a report of $100,000 lost in rigged card games (the precise truth). While the average *Journal* reader would most likely look beyond the fact that Ramada loses some money to rigged card games and look to the actual amount of loss attributable to such card games, the difference between the alleged libel and precise truth in this instance, $100,000, is, in my view, insignifi-

cant when dealing with a corporation as large as Ramada. Comparing the precise truth to the alleged libel, I am satisfied, as a matter of law, that the precise truth would have the same effect on the average reader of the *Journal* as the alleged libel, and therefore I find that the challenged statements are substantially true.

Accordingly, summary judgment is HEREBY GRANTED in favor of Dow Jones with respect to the article's report of $200,000 lost in rigged card games.

*Paragraphs 4 and 16, Appendix "A":*

"Ramada's Gambling Operations" also reported that Ramada had been sued for mismanagement by the former owners of the Las Vegas Tropicana at paragraphs 4 and 16 found in Appendix "A". Dow Jones contends that the challenged statements are substantially true. In considering the substantial truth of the statements, the precise truth in this instance is the objective truth and not the contents of the Manual Reports since this subject was not covered by the Reports.

Viewing the evidence in a light most favorable to Ramada, the objective truth is as follows: As of the publication date of the challenged articles, August, 1981, the former owners of the Las Vegas Tropicana had not filed a suit against Ramada alleging mismanagement. The former owners did sue Ramada in February, 1981, however, the claims did not allege mismanagement of the casino. Rather, it pertained to a breach of Ramada's alleged agreement to provide the former owners with "veto power" over management decisions.

While a formal complaint had not been filed by the former owners against Ramada as of August, 1981, there was a dispute between them relating to management issues, and the former owners had threatened litigation. The threatened lawsuit, however, was nearing settlement as of August, 1981. This dispute was closely linked, in the minds of Ramada management and the former owners, with a lawsuit involving many of the same parties, which was pending in Las Vegas at the time the *Journal* articles were published. The Las Vegas suit was filed in February,

1981. It charged Ramada, its officers and others with theft and violations of the federal racketeering laws and sought more than $6 million in damages.

The "gist" or "sting" of the challenged statements appears to be that the former owners of the Las Vegas Tropicana were of the view that Ramada was mismanaging the Tropicana, and they therefore decided to bring suit against Ramada. However, Ramada does not challenge the portion of "Ramada's Gambling Operations" at paragraph 16 which states that "the previous operators claim that mismanagement of the operation by Ramada has kept the purchase price below what it should be." Therefore, the precise truth is that the former owners did hold the view that Ramada was mismanaging the Tropicana, that Ramada was negotiating with the prior owners to avoid a suit alleging mismanagement (drafts of the settlement agreement were being revised as late as September, 1981), and that Ramada was defending a separate suit based on equally serious charges.

Comparing the precise truth to the alleged libel, I am satisfied, as a matter of law, that the precise truth would have the same effect on the mind of the average reader of the *Journal* as the alleged libel. Given the nature of the dissatisfaction by former owners with Ramada management and the significant legal activity surrounding that dissatisfaction, I am convinced, as a matter of law, that the actual pendency of a lawsuit would not make a difference in the mind of the average reader of the *Journal*. The "gist" or "sting" is the owners' significant concern with the poor management of Ramada. I, therefore, find that the challenged statements are substantially true.

Accordingly, summary judgment is HEREBY GRANTED in favor of Dow Jones with respect to the statements challenged by Ramada in paragraphs 4 and 16, Appendix "A", pertaining to a suit brought by the former owners against Ramada based on mismanagement.

*Paragraphs 14 and 15, Appendix "A":*

 Dow Jones contends that the challenged statements regarding the Las Vegas Tropicana, in paragraphs 14 and 15 in Appendix "A", are also not defamatory because they are substantially true. Ramada does not dispute the objective truth of the statement challenged in paragraph 14, but rather challenges the implications that flow from the statement. It is contended that the statement implies that Ramada was negligent for failing to obtain the financial statements from the former owners, and that such statement is therefore false and misleading.

The precise truth of the statement is apparent from its surrounding context, which is not challenged by Ramada. Ramada does not challenge the statement in paragraph 14 that previous financial statements were never received by Ramada. It necessarily follows that without these financial statements an accurate financial picture of the casino could not be completed. The alleged implications of negligence are however negated by the statement in paragraph 5, Appendix "A", not challenged by Ramada, indicating that Ramada "repeatedly demanded the documents."

Based on the foregoing, I am satisfied, that the alleged libel contained in paragraph 14 is a substantially true statement, and does not give use to a false and misleading implication of negligence on the part of Ramada.

Accordingly, summary judgment is HEREBY GRANTED in favor of Dow Jones with respect to the statements challenged by Ramada in paragraph 14, Appendix "A".

*Paragraphs 9 and 15, Appendix "A":*

 Dow Jones contends the language regarding the refusal of Ramada to comment on questions involving financial statements and the alleged audit, contained in paragraphs 9 and 15 in Appendix "A", are not defamatory as a matter of law.

With regard to paragraph 9, viewing the evidence in a light most favorable to Ramada, the precise truth is that the Ramada spokesperson did acknowledge that Philip

Manuel had been retained to review Ramada's casino operations. As to paragraph 15, Ramada did not limit its comments to the statement that the financial statements were not needed, but rather explained in detail why Ramada had waived the requirement for audited financial statements from the former owners and why the failure to obtain them had not harmed Ramada.

Dow Jones contends that the reported "no comments" are not defamatory as a matter of law since they do not debase Ramada's good name or hold Ramada up to public ridicule, hatred or contempt. However, it is necessary to consider the "no comments" in the context of the article as a whole.

In the midst of an article reporting that Ramada had lost a substantial amount of money—$30 million—attributable to employee theft and skimming, the "no comments" are in my view highly susceptible to the interpretation that Ramada was attempting to cover up its problems. For a public corporation with legally imposed reporting requirements, the "no comments" are, therefore in my view, capable of a defamatory meaning.

Accordingly, summary judgment is HEREBY DENIED with respect to the "no comments" reported in "Ramada's Gambling Operations" at paragraphs 9 and 15, Appendix "A".

*Paragraphs 7 and 8, Appendix "A":*

 Ramada challenges the report of how Philip Manual came to be hired, found in paragraphs 7 and 8 in Appendix "A". Dow Jones contends that the alleged libel is substantially true.

Viewing the evidence in a light most favorable to Ramada, the precise truth is that Manual, Drinkhall's alleged source of the challenged statement, never told Drinkhall that Ramada hired him because they were "alarmed" about the casino's poor performance. Manual was retained by Ramada, rather, because they wanted to identify "vulnerabilities" in the casino operation which they had recently acquired. The article's report of "alarm" takes on a defamatory meaning when considered alongside the article's report of $30 million in actual losses. Notwithstanding the fact that the article reported a pretax profit of $9.1 million in 1980, it also reports $30 million in actual losses. This could be confusing even to the average reader of the *Journal.* The precise truth, which is that Manual was hired to identify "vulnerabilities" and that Manual reported potential, not actual, losses based on statistical analysis, would in my view be less damaging. The article's statement that Ramada was "alarmed" at the poor performance of the Las Vegas Tropicana may not therefore in my view be considered as being substantially true.

Based on the foregoing, I am satisfied that a reasonable juror could conclude that the alleged libel could be more damaging in the mind of the average reader of the *Journal* than would have been the precise truth.

Accordingly, summary judgment is HEREBY DENIED with respect to the alleged libel contained in paragraph 7, Appendix "A".

*Paragraphs 3 and 6, Appendix "A":*

 Ramada also challenges several statements contained in paragraphs 3 and 6 of "Ramada's Gambling Operations" pertaining to the Atlantic City Tropicana. Viewing the evidence in a light most favorable to Ramada, it appears that the foregoing statements are fabrications and are not attributable to a New Jersey gambling official.

The fact that the statements were attributable to a New Jersey gambling official would indicate, to the average reader of the *Journal,* that Ramada's Atlantic City gambling license was in jeopardy as a result of the alleged problems at Ramada's Las Vegas casino. Had the precise truth been reported, these statements would have been absent from "Ramada's Gambling Operations" article. The inclusion of these statements clearly could produce a different, more damaging, effect on the mind of the average reader of the *Journal,* and, therefore, the statements cannot be substantially true.

The "no comment" appearing at the end of paragraph 6 is also, according to Ramada's evidence, a fabrication. The "no comment" is capable of a defamatory meaning in the context of the other allegedly libelous statements in the article, since it makes it appear as if Ramada is refusing to disclose its problems to the investing public.

Based on the foregoing, I am satisfied that a reasonable juror could conclude the alleged libel was more damaging in the mind of the average reader of the *Journal* than would have been the precise truth.

Accordingly, summary judgment is HEREBY DENIED with respect to the alleged libel contained in paragraphs 3 and 6, Appendix "A".

*Paragraphs 17 and 18, Appendix "A":*

 Ramada also challenges the article's account of the estimated cost and opening date of the Atlantic City Tropicana found at paragraphs 17 and 18, Appendix "A".

Drinkhall has testified that the information in paragraph 18 came from Philip Manual. Manual denies giving this information to Drinkhall. Since on summary judgment the evidence must be viewed in a light most favorable to Ramada, the statement contained in paragraph 18 must be viewed as a fabrication. The precise truth is that the Atlantic City Tropicana opened in November, 1981, at a cost of $337 million. If Ramada were challenging the statement purely on the basis of the gap between the actual cost and the opening date and the figures quoted in paragraph 18, I would be inclined to grant summary judgment in favor of Dow Jones on the basis of substantial truth. However, the defamatory implication, in my view, arises from the fact that the statement in paragraph 18 is attributed to a Ramada official, and it immediately follows a report of a recent public statement issued by Ramada the week before, stating that the cost is estimated to be $330 million with a possible October opening. Within the context of the article as a whole, which reports that Ramada is having significant financial troubles in entering the casino business and has little or no comment about those troubles, the statement in paragraph 18 could make it appear as though Ramada is speaking out of both sides of its mouth. The impression is left that Ramada is not being totally candid with the investing public.

I am satisfied that a reasonable juror could conclude that the alleged libel was more damaging in the mind of the average reader of the *Journal* than would have been a truthful account, which would have omitted the statement entirely.

Accordingly, summary judgment is HEREBY DENIED with respect to the alleged libel contained in paragraph 18, Appendix "A".

*Paragraph 26, Appendix "A":*

*Journal* reporter John Andrews ("Andrews") contributed paragraphs 26 and 27 to "Ramada's Gambling Operations," a portion of paragraph 26 is challenged by Ramada. Ramada does not dispute the fact that the estimate referred to in paragraph 26 was obtained from a Las Vegas casino executive. Its main objection appears to be that the report is not balanced in that the concensus among the professionals, various security analysts, was that the break-even figure was between $12 million and $15 million, and that the reporter, Andrews, was aware of much lower estimates prior to the publication of the article.

Viewing the evidence in a light most favorable to Ramada, it appears that Andrews was aware of a much lower break-even estimate of between $12.5 and $13.5 million provided by a Senior Securities Analyst at Bear, Stearns in New York. Without the lower break-even estimates the implication of paragraph 26 is that Ramada will be unable to achieve the necessary break-even figure because of the enormous size of the Atlantic City Tropicana and that the company will be under financial pressure because of losses.

It is not enough that what Dow Jones printed—that a Las Vegas casino executive did provide a break-even estimate of $24.8 million—was literally true. *Memphis Pub. Co. v. Nichols*, Tenn.Supr., 569 S.W.2d 412 (1978). The question is whether "the *meaning* reasonably conveyed by the pub-

lished words is defamatory...." *Id.* As stated in *Memphis Pub. Co.*, 569 S.W.2d at 420:

> It is no defense whatever that individual statements within the article were literally true. Truth is available as an absolute defense only when the defamatory meaning conveyed by the words is true. *See Brown v. First National Bank*, 193 N.W.2d 547, 553 (Iowa 1972).

In *Memphis Pub. Co.* the defendant-newspaper reported an incident where a woman was shot in her home by another woman. While the undisputed proof showed that at the time of the shooting the victim's husband and the assailant's husband as well as two neighbors were sitting in the living room talking, the newspaper reported as follows:

> Officers said the incident took place Thursday night after the suspect arrived at the Nichols [victim's] home and found her husband there with Mrs. Nichols.

The victim and her husband brought an action for defamation, contending that the article published by the defendant-newspaper falsely implied that the victim and the assailant's husband were having an adulterous affair, and were caught by the assailant.

The article was held to be false and defamatory since the published statement distorted the truth. "The publication of the complete facts could not conceivably have led the reader to conclude that Mrs. Nichols [the victim] and Mr. Newton [the assailant's husband] had an adulterous relationship."

The Supreme Court of Connecticut, in *Strada v. Conn. Newspapers, Inc.*, 193 Conn. 313, 477 A.2d 1005, 1010 (1984), distinguished the *Memphis Pub. Co.* case on the facts, but in doing so recognized the proposition that true facts leading to a false inference are actionable (even where the plaintiff is a public figure), where the false inference is a result of the defendant's failure to print *all* the relevant and true facts. The *Strada* Court stated at 1010:

> Unlike *Memphis Publishing Co. v. Nichols*, supra, the plaintiff here [a public official] has not alleged, nor has our examination of the record disclosed, the existence of additional material facts which, if reported, would have changed the tone of the article. In the absence of such undisclosed facts, first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident.

Ramada contends that Dow Jones failed to disclose additional material facts, namely, that there were other break-even estimates by respected security analysts which were significantly lower than the $24.8 million estimate reported by the *Journal*, and that without such additional facts the $24.8 million estimate, while literally true, leads to a false inference and is, therefore, actionable. Dow Jones contends that the report of the break-even estimate is not actionable because it constitutes protected opinion. However, whether the break-even estimate is fact or opinion is immaterial to the instant analysis. It is the failure of the *Journal* to report the existence of other break-even estimates or opinions, of which it was aware, which were favorable to Ramada, which render the statement in paragraph 26 capable of a defamatory meaning. The *existence* of a particular estimate may be perceived as a fact. Whereas the *Journal* reported one fact, the existence of the break-even estimate of the Las Vegas casino executive, it failed to disclose other material facts, namely, the *existence* of other break-even estimates favorable to Ramada which if reported would have changed the tone of the article.

I am satisfied that a reasonable juror could conclude that had the undisclosed facts (the lower break-even estimates) been reported, that would have been less damaging in the mind of the average reader of the *Journal* than was the failure to so report the additional facts.

Accordingly, summary judgment is HEREBY DENIED with respect to the alleged libel in paragraph 26, Appendix "A".

*Paragraph 2, Appendix "A":*

 In considering the alleged defamatory statement concerning Ramada's entry into the casino world, contained in paragraph 2, Appendix "A", the fact-opinion analysis is controlling.

In determining whether a statement is fact or opinion the Court in *Riley v. Moyed,* supra, applied the four part test adopted by *Ollman v. Evans,* D.D.C., 750 F.2d 970 (1984): (1) considering the common usage or meaning of the specific language of the challenged statement, is the statement indefinite and ambiguous; (2) whether the statement is capable of being objectively characterized as true or false; (3) considering the entire article in which the statement appears, to what extent will the unchallenged language surrounding the allegedly defamatory statement influence the average reader's readiness to infer that a particular statement has factual content; and (4) the broader social context into which the statement fits.

In considering these four factors, the Court must examine the statement from the perspective of the ordinary reader. *Riley v. Moyed,* supra. Under this analysis, I am convinced that the ordinary reader would treat the statement that Ramada "is having anything but a smooth entry into ... the world of casino gambling", as protected "opinion" rather than "fact."

First, the common usage or meaning of the statement is impressionistic rather than factual. It consists of the writer's conclusions based upon facts found in the uncontested portions of that same paragraph.

Second, it is apparent that the challenged statement cannot be objectively verified. An average reader trying to ascertain whether Ramada's entry was "smooth" would only be able to make his own subjective determinations of the kind of entry Ramada was making based upon facts within his knowledge.

Third, considering the statement in its surrounding context, it is reasonable to conclude that the challenged statement is merely the writer's opinion based *inter alia* upon the uncontested, and therefore, I assume factual, portions of the article.

Fourth, analyzed within the broader social context in which the article appeared, i.e., that it addressed an issue of current concern regarding the success of Ramada in the casino world, "language which might otherwise be considered statements of fact have here assumed the character of statements of opinion." *Riley v. Moyed,* supra at 9, *citing Okun v. Superior Court of Los Angeles County,* 29 Cal.3d 442, 175 Cal.Rptr. 157, 162, 629 P.2d 1369, 1374 (en banc), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 673, 70 L.Ed.2d 641 (1981).

Accordingly, I find that the statement challenged by Ramada in paragraph 2 is protected opinion and is therefore not defamatory as a matter of law. Summary judgment is HEREBY GRANTED in favor of Dow Jones with respect to the statement challenged by Ramada in paragraph 2, Appendix "A".

**B. The August 20, 1981 "Isbell Quits" article**

Turning to the August 20, 1981 article appearing in the *Journal*—"Isbell Quits"—Ramada challenges statements contained in three paragraphs, all of which may be found in Appendix "B" to this opinion. "Isbell Quits" is, in part, a response by the *Journal* to a public statement issued by Ramada on August 19, 1981 denying that $30 million of revenue had been stolen and that any abnormal problem existed with respect to uncollectible gaming debts, and denying that it had been served with any mismanagement action.

*Paragaphs 15 and 19, Appendix "B":*

 Ramada contends that paragraphs 15 and 19, Appendix "B", constitute a republication of defamatory material printed in the August 17th article "Ramada's Gambling Operations". To make this determination, the foregoing statements found in these paragraphs must be considered in the context of the surrounding paragraphs in Appendix "B" which are not challenged. The pertinent paragraphs to be analyzed are paragraphs 16–18 and paragraphs 20 and 21.

Viewing the context in which paragraphs 15 and 19 appear, I am satisfied that the republication of these statements is protected. I base my conclusion on the reasoning of the Court in *Dowd v. Calabrese*, D.D.C., 589 F.Supp. 1206 (1984), where the Court concluded that republication of allegations appearing in an earlier *Journal* article were protected, noting that:

> these references [to statements contained in the earlier article] are minimal, they are presented in a non-sensational light, and do no more than to provide the context for the description of exonerating portions of the Justice Department report.

*Id.* at 118. Similarly, I am satisfied that the *Journal's* republication of two statements from "Ramada's Gambling Operations" are "minimal" references which merely provide context for the description of the "exonerating portions" of Ramada's public denials contained in the August 19, 1981 press release. Based on the foregoing, I conclude, as a matter of law, that the challenged statements are protected republication meant only for background material. Accordingly, summary judgment is HEREBY GRANTED with respect to paragraphs 15 and 19.

*Paragraph 22, Appendix "B":*

■ The third and final paragraph which is challenged by Ramada is paragraph 22, Appendix "B". The portion of paragraph 22 which is not underlined is not challenged by Ramada, and so must be accepted as true. In light of the unchallenged portion, which demonstrates that the Ramada spokesman acknowledged the existence of the report and related that he could not discuss its contents due to attorney-client privilege, I am satisfied that the challenged portion is true and, therefore, cannot be defamatory and is not actionable as a matter of law.

Accordingly, summary judgment is HEREBY GRANTED in favor of Dow Jones with respect to the statement challenged by Ramada in paragraph 22, Appendix "B".

## II. NEGLIGENCE

In light of the fact that Ramada failed to respond to Dow Jones' contention that Ramada's claim for negligence fails to state a claim for relief, I interpret Ramada's silence as a concession on this point. Accordingly, summary judgment is HEREBY GRANTED in favor of Dow Jones with respect to Ramada's negligence claim.

## III. INJURIOUS FALSEHOOD

Ramada's third cause of action is for "injurious falsehood." In support of its motion for summary judgment on this claim, Dow Jones advances two alternative theories, namely, that no Delaware cases have recognized the tort of injurious falsehood; and that the claim may not be pursued because the damages sought are identical to those sought in the defamation claim.

■ Turning to the first theory, although not heretofore expressly recognized by the Delaware courts, the tort of injurious falsehood is a widely accepted tort at common law. *See* Restatement, Second, Torts. Furthermore, it is acknowledged by Ramada as well as by Dow Jones that Delaware follows the Restatement, Second, Torts in defamation-related issues. *See e.g.,* *Read v. News–Journal Co.*, Del.Supr., 474 A.2d 119 (1984); *Slawik v. News–Journal Co.*, Del.Supr., 428 A.2d 15 (1981). In light of the foregoing, I conclude that Ramada may pursue this theory of the case.

■ Dow Jones next contends that based on the language in comment (g) to § 623A of the Restatement, Second, Torts, that Ramada cannot assert claims for both defamation and for injurious falsehood in the same suit because the damages sought in each claim are identical.

> The precise language relied upon states: Action may be brought in the same suit for both torts, however, so long as the damages are not duplicated.

Ramada contends that this language stands for the fundamental concept of law that the two torts may be brought as alternative theories for recovery, but, in the event plaintiff prevails on both theories,

double recovery is not permitted. *See* Del. R.Civ.Proc. 8(e)(2). I agree. Each tort, although similar, has different elements. To recover under injurious falsehood, Ramada must show that Dow Jones published a false statement intending to cause pecuniary injury to Ramada. Restatement, Second, Torts § 623A. Whereas under a defamation theory, Ramada must show Dow Jones published the false statement with a reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, supra. Since the elements differ, it is possible for Ramada to recover under one theory and not under another. To deny Ramada the opportunity to assert these alternative theories would be to ignore a well-established legal tenet.

Accordingly, Dow Jones' motion for summary judgment on the injurious falsehood claim is HEREBY DENIED.

## IV. SPECIAL DAMAGES

The final claim invovled in Dow Jones' motion for summary judgment is whether Ramada may recover special damages for the cost of defending a series of shareholder actions brought, allegedly, as the result of the *Journal* articles.

The factual background behind these shareholder suits is as follows: Beginning on August 21, 1981, with *Shapiro v. Ramada Inns, Inc.*, 81–2680 (D.N.J.), several lawsuits were filed by Ramada shareholders against Ramada. Eventually the complaints were consolidated into one complaint in the United States District Court for the District of Delaware. *In Re Ramada Inns Securities Litigation*, No. 81–456 (D.Del.) (filed January 27, 1982). Immediately prior to the institution of these shareholder suits, on August 17 and 20, 1981, the two *Journal* articles which are the subject of this action, were published.

The consolidated suit represented the previously filed individual suits alleging that, between January 28, 1979 and August 17, 1981, Ramada, by means of material omissions and misrepresentations,[5] fraudulently inflated the price of the common stock of Ramada which ultimately caused loss as to the plaintiff-shareholders who purchased stock during that period. After discovery and negotiations, Ramada agreed to settle the claims, which settlement was approved on October 12, 1984.

Ramada seeks recovery of their legal costs in defending the suits brought by the shareholders from Dow Jones, claiming that the *Journal* articles were the "legal cause" of the shareholder litigation. Dow Jones asserts that summary judgment should be granted because: (1) the allegedly libelous portions of the *Journal* articles were not the "legal cause" of Ramada's losses; and (2) in any event the "American Rule" precludes Ramada from recovering legal fees incurred.

### "Legal Cause"

One who has committed a libel is also responsible "for any special harm legally caused by the defamatory publication." Restatement, Second, Torts § 622. The libel is the "legal cause" of the special harm if it is a "substantial factor" in bringing about the harm. *Id.* § 622A; *See also* § 431 ("legal cause" in general tort law). It is undisputed that the *Journal* articles are not the *sole* reason for the commencement of the shareholder suits; however, it is disputed whether they were a substantial factor in bringing about the litigation. The following factors have been considered, by themselves or in combination with one another, as being important in determining whether conduct was a "substantial factor" in bringing about the harm:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up

---

**5.** The omissions and the misrepresentations alleged include *inter alia* failure to disclose: (1) the true status of the construction of the Ramada Hotel and Casino in Atlantic City, New Jersey, including the change of plans, construction difficulties and cost overruns; and (2) certain facts in connection with the purchase and status of the Tropicana Hotel and Country Club in Las Vegas, Nevada, including lack of proper investigation and subsequent mismanagement. *See also In Re Ramada Inns Securities Litigation*, D.Del., 550 F.Supp. 1127 (1982).

to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

Restatement, Second, Torts § 433; *see also Vattimo v. Lower Bucks Hosp., Inc.*, 502 Pa. 241, 465 A.2d 1231 (1983). Ordinarily the determination of whether the conduct alleged was a substantial factor in bringing about the harm is a question of fact for the jury. *Id.* 465 A.2d at 1234; *see also* Restatement, Second, Torts § 434.

■ In evaluating the above considerations, Dow Jones relies primarily on the first consideration to support their proposition that the *Journal* articles were only one of many factors, whose effect is so diluted by the other factors (primarily Ramada's own wrongdoing), that they cannot be a substantial factor in bringing about the harm. As evidence of these other factors Dow Jones submitted the Affidavit of Richard D. Greenfield, Esquire, counsel for one of the plaintiff's in the shareholder litigation and representative of all other plaintiffs' counsel in the litigation, to set forth information available to plaintiffs' counsel at the time of filing the complaint. Mr. Greenfield states:

> I had the benefit of extensive investigation performed by plaintiffs' counsel including, *inter alia*, materials made available by the New Jersey Casino Control Commission ("the Commission"), documents publically disseminated by defendant Ramada Inns Inc. ("Ramada") and its competitors during and after the Class Period (January 28, 1979 through August 17, 1981, inclusive), articles appearing in the news media and periodicals, brokerage firm research reports and conversations with a leading securities analyst, Mr. Marvin Roffman of Janney Montgomery Scott, Inc. of Philadelphia....

*Id.* at 1–2.

Additionally, although many of the allegations in the original complaint were taken from the *Journal* articles, Dow Jones has pointed to other allegations which were not contained in the articles and thus were obtained elsewhere.

On the other hand, Ramada relies primarily on the third consideration to support its contention that the fact the lawsuits were commenced within days of the publications by the *Journal* (the articles were published on August 17 and 20, 1981 and the first class action suit was filed against Ramada August 21, 1981), is strong evidence that the articles were a substantial factor in the commencement of the shareholder suits. In addition, Ramada relies upon deposition testimony wherein plaintiff, Morton Shapiro, testified that he was initially prompted to consult counsel after reading one of the *Journal* articles, Shapiro Deposition, p. 54–55; and the District Court decision where a Rule 11 challenge to the consolidated shareholders' complaint was struck by the District Judge who held that the *Journal* articles provided a good faith basis for filing the lawsuit, even if the articles were relied upon "solely." *In Re Ramada Inns Securities Litigation*, supra, at 1135.

Ramada has presented evidence which supports the conclusion that the *Journal* articles were a "substantial factor" in bringing about the shareholder litigation. Dow Jones has also presented evidence which supports the conclusion that the litigation would have been brought even if the alleged defamation had been omitted from the articles. In the instant case, I am satisfied that it is not for the Court to weigh the evidence. *Oliver B. Cannon & Sons v. Dorr–Oliver Inc.*, Del.Super., 312 A.2d 322 (1973). I am also satisfied that the average juror may reasonably differ as to the result and, therefore, conclude that Ramada may pursue this theory of damage recovery.

### The "American Rule"

Dow Jones also argues that Ramada may not recover its expenses arising out of the shareholder actions and thus summary judgment must be granted because Delaware courts apply the "American Rule." *See Slawik v. State of Delaware*, Del. Supr., 480 A.2d 636 (1984). The American Rule, simply stated, is that in the absence

of statute or contractual agreement, neither party to a tort action can recover legal fees or expenses from the other. *See* Restatement, Second, Torts § 914 comment a.; *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

■ However, whether characterized as an exception to the American Rule or as a rule in its own right, § 914(2) of the Restatement, Second, Torts allows for the recovery of legal fees and costs from an earlier action where:

One who through the tort of another has been required to act in the protection of his own interests in bringing or defending an action against a third person...."

*Id.*

I am satisfied that the facts of the present case fall squarely within the language of § 914(2) of the Restatement and I have been advised of no Delaware authority to the contrary.

Accordingly, Dow Jones' motion for summary judgment is HEREBY DENIED on Ramada's claim for special damages.

IT IS SO ORDERED.

## APPENDIX "A"

### "RAMADA GAMBLING OPERATIONS"

1. Ramada Inns Inc. assured shareholders in its 1980 annual report that its entry into the gambling business has been "carefully planned" and that the company expects success through "tight financial and management control."

2. *But since then, it has become clear that the international hotel chain is having anything but a smooth entry into the Byzantine world of casino gambling.* Last week, the company again raised its estimate of construction costs for its Tropicana hotel-casino in Altantic City—to $330 million from the original $130 million forecast. The report raises doubts that the New Jersey project will open this year; less than two months ago Ramada Inns said it expected the project to cost $280 million and that it would open by Labor Day.

3. *But that isn't the only problem confronting the company. It has been learned that Ramada's hotel-casino in Las Vegas has lost more than $30 million to thefts by employees and outsiders since the company acquired it in December 1979. Further, a New Jersey gambling official, when informed of the alleged thefts, suggests that they could cause problems for Ramada in receiving a license to operate its Atlantic City casino.*

4. *And it is also understood that Ramada is being sued by the former operators of the Las Vegas establishment, also called the Tropicana, for alleged mismanagement.*

5. Ramada declines to discuss the problems of its gambling operations, saying through a spokesman that "it wouldn't be in the best interests of the shareholders or the company to discuss this matter." But last week the company said that it may try to renegotiate terms of some credit agreements and that it expects lower 1981 earnings as a result of delays on the New Jersey project.

6. The New Jersey gambling official—who wasn't aware of the alleged problems at Ramada's Las Vegas casino—says those problems *"indicate a question of management ability"* to run a gambling operation—a crucial factor in the state's pending decision on whether to grant Ramada a license. *Ramada wouldn't comment on the official's statement.*

7. *Earlier this year, Ramada management reportedly became alarmed at the poor performance of the Tropicana in Las Vegas.* Ramada doesn't break out its gambling results in its financial statement. But in 1980, according to a company filing with the Securities and Exchange Commission, revenue from both the hotel and the casino totaled $75.5 million with pre-tax profit of $9.1 million.

8. The company hired Philip R. Manual, a former federal investigator specializing in white-collar and organized crime, to conduct an audit of the casino operations. Using a battery of former Internal Revenue Service intelligence agents who specialize

in casino-skimming cases, *Mr. Manual allegedly discovered that roughly $30 million had been skimmed from the Tropicana over the past year and a half.*

9. In a telephone interview, Mr. Manual confirms that he was hired to do some work at the Tropicana in Las Vegas but says he won't discuss his client's business. *Ramada wouldn't comment on whether an audit was conducted.*

10. One problem at the casino supposedly has been that Ramada kept many of the casino employees hired by the previous operators. These include positions below that of casino manager. According to Federal Bureau of Investigation affidavits and wiretap transcripts filed in federal court in Kansas City in 1979, the Tropicana was then allegedly controlled by members of the Kansas City Mafia, who were actively involved in illegal skimming of casino revenues. No charges have yet been filed in the investigation, and the previous operators of the Tropicana have denied that organized crime figures held any hidden interests in the operation.

11. *Mr. Manual's audit apparently found that about $20 million of casino revenue had been stolen through various schemes. In addition, roughly $11 million in gambling markers, or IOU's, mostly from high-stakes gamblers from Mexico, are apparently uncollectible because of phony credit documents.*

12. Most recently, the casino allegedly lost *about $200,000* in rigged card games engineered by insiders. In this instance, a team of men, allegedly aided by casino personnel, marked the Tropicana's cards used for playing "21", or blackjack. Then, the group of what is described as "sophisticated card readers" used special lenses to read the cards and bilk the casino.

13. Dale Askew, a member of the Nevada Gaming Control Board, says the board is aware of the card-reading allegations and is investigating. But he says he is unaware of any reports of broader thefts. He notes that there isn't any requirement for Ramada to immediately inform the board of such thefts.

14. *The outside investigators hired by Ramada apparently can't compile an accurate financial picture of the casino* because Ramada never received financial statements from the previous owners. Although the 1979 contract contained a clause saying the sale was conditioned on the sellers providing certified financial statements, a 1981 Ramada Inns memo notes that "neither audited nor unaudited financial statements (of the Tropicana) are available for 1978 and 1979."

15. Correspondence between Ramada and the previous operators in 1980 shows that the hotel repeatedly demanded the documents but never received them. Last year, Ramada finally did receive a balance sheet for the 10 months ended Oct. 31, 1979. Those documents, prepared by the previous owners instead of an accountant, contain notations that show Ramada wasn't convinced of their accuracy. (*The Ramada spokesman won't comment except to say that the financial statements weren't needed*).

16. *On top of that, the previous operators sued Ramada earlier this year, charging that Ramada is mismanaging the Tropicana, according to court papers filed in federal court in Los Angeles.* The sales price of the company that operated the Tropicana is tied to a multiple of pretax income in 1981 and 1982, and the previous operators claim that mismanagement of the operation by Ramada has kept the purchase price below what it should be. *Ramada denied the charges in court papers, and the case is pending.*

17. In New Jersey, Ramada is faced with other financial problems. Its planned 531-room hotel and casino in Atlantic City has been plagued by huge cost overruns. Last Friday, the company once again raised the project's estimated cost, this time to $330 million, and said it "may" open in October.

18. *A Ramada official, though, says the hotel-casino is likely to end up costing "at least" $350 million, and that it will open in December, "if we're lucky."*

19. The cost overruns were apparently caused by both regulatory setback, which

forced the company to abandon plans to refurbish an old structure and instead build a new hotel, and by what some say are serious labor problems at the site. Workmen are allegedly dragging their feet because the Tropicana is expected to be the last new casino in Atlantic City for at least two years. For its part, Ramada discounts reports of labor problems and maintains the delays are caused by the work force's unfamiliarity with the ambitious design of the hotel. When it opens, the Tropicana is expected to be the most luxurious casino in Atlantic City.

20. Ramada also said Friday that because of the delays, it would report reduced 1981 earnings. In 1980, earnings from continuing operations were $15.1 million, or 53 cents a share, on revenue of $387.6 million. After discontinued operations, net was $17.5 million, or 61 cents a share.

21. The company also said it is meeting with lenders to "assure the availability of additional funding on the Atlantic City project" and is considering selling some assets and curtailing other capital expenditures. A spokesman indicated the company may seek an extension of its $150 million revolving credit agreements as well as changes in the terms of the agreements.

22. Ramada is already heavily in debt because of the Atlantic City Tropicana, and analysts indicate that soaring interest costs plus startup losses in Atlantic City will put the company in a cash bind for the next two to three years. "The financial situation is very tight right now," says George Novello, an analyst with E.F. Hutton & Co. Earlier this year, Hutton issued a bullish report on the company.

23. Daniel Lee, an analyst with Drexel Burnham Lambert Inc., says that over half of the estimated $330 million cost is funded with debt tied to the prime rate, and he estimates the company's interest expense could jump to about $75 million in 1982. In 1980, the company reported interest expense of $34.3 million.

24. Thomas C. Martin, Ramada's chief financial officer, said on Friday that he was unable to estimate Ramada's 1981 or 1982 interest expense. But he said it would take an "awfully high prime rate" for the company's interest expense to jump to $75 million.

25. If interest rates come down, Ramada can solve some of its problems by refinancing its debt. But it's likely that the Atlantic City project will still be a drain on the company for some time. The hotel isn't scheduled to open until at least October, but it isn't expected to do much business until the 1982 summer season. Even then the New Jersey Tropicana will have to grab a large slice of the city's gambling trade to turn a profit.

26. *A casino executive in Las Vegas estimates that it will cost Ramada $825,-000 a day to operate the Tropicana, suggesting $24.8 million in hotel and gaming revenues would be needed monthly to reach the break even point.* By comparison, Mr. Lee notes that casino grosses at Resorts International, the city's leader, have averaged only about $15.9 million in 1981's first seven months. Observers estimate that gaming revenues generally account for about 80% of a hotel-casino's total gross.

27. Last April, when the hotel-casino's estimated cost was only $235 million, Ramada said it would need a monthly gross win of $10 million to break even.

## APPENDIX "B"

### "ISBELL QUITS"

1. PHOENIX—M. William Isbell resigned as chairman, president and chief executive officer of Ramada Inns Inc.

2. The departure of the 45–year–old executive comes as the company is struggling with mounting costs of its planned Atlantic City, N.J., hotel-casino and a controversy over allegations of thefts at its Tropicana Hotel in Las Vegas.

3. The international hotel chain's board of directors, composed mostly of outside members, passed over other Ramada executives to pick Richard Snell, 50, a partner in a Phoenix law firm, as chairman and chief executive. Although the company

didn't say the position was temporary, industry observers said they believed Mr. Snell was brought in to help clean up financial and legal difficulties at the company and to find a new chief executive officer.

4. Mr. Isbell declined to say why he resigned, but the company said his resignation didn't result from the publication Monday of a Wall Street Journal article describing the company's skyrocketing Atlantic City hotel-casino costs and alleged thefts by employes [sic] and outsiders at the hotel-casino in Las Vegas. Ramada charged in a press release and at a news conference in Las Vegas that the Journal's story contained substantial errors.

5. Specifically, the company said that "no systematic skimming or stealing has occurred at the Tropicana's casino since Ramada assumed ownership."

6. Mr. Isbell, a son of Marion W. Isbell, a founder of the company, was elected president of Ramada in 1970, chief executive in 1972 and chairman in 1979. Industry sources noted that it's unusual for a company to force a son of a founder to resign, but added that the Ramada board had been under pressure from the company's banks to take some action on the company's financial difficulties.

7. Continental Illinois National Bank of Chicago is Ramada Inns' lead bank. First National Bank of Arizona is also among the company's other banks and is represented on Ramada's board by Edward M. Carson, the bank's president.

8. In recent years, Ramada has been criticized by financial analysts and industry observers. The critics complained of a revolving door for top executives and questioned the ability of Ramada's management to operate a casino. The company didn't enter the gambling business until 1979, with the acquisition of the hotel-casino in Las Vegas.

9. Mr. Snell was elected a member of the Ramada board just this year. He is a partner in the law firm of Snell & Wilmer. In September 1980 the law firm was appointed the company's general counsel. The firm did legal work for Ramada in 1979 and 1980, the company's recent proxy statement indicates.

10. Mr. Snell's legal expertise is in the fields of securities and finance.

11. Mr. Isbell's contract with Ramada, ending Dec. 1, 1985, provides him minimum compensation of $225,000 a year. He owns 89,191 common shares of the company's 27.1 million shares outstanding.

12. Industry analysts cite the planned Atlantic City hotel-casino as Ramada's main financial problem. Last week the company again raised its estimate of construction costs for the facility to $330 million from the original $130 million forecast.

13. Because of Atlantic City costs, Ramada said last week that it expects to report reduced 1981 earnings. In 1980, net income was $17.5 million, or 61 cents a share. Analysts also have said that soaring interest costs and start-up losses at the new hotel-casino are likely to put the company in a cash bind for the next two years.

14. Ramada's stock closed in New York Stock Exchange composite trading yesterday at $7.375, up 62.5 cents, on volume of 326,000 shares. Its price had declined early this week.

15. *The Journal story Monday asserted that an audit prepared by Philip R. Manuel apparently found that about $20 million of casino revenue had been stolen through various schemes. In addition, the story said that roughly $11 million in gambling makers [sic], or IOU's, mostly from high-stakes gamblers from Mexico, are apparently uncollectable because of phony credit documents.*

16. Ramada said yesterday that characterization was "totally unsubstantiated" by a report prepared for the company by Mr. Manuel.

17. Reached by the Journal yesterday, Mr. Manuel said the statement in the Journal regarding the $31 million loss "is inaccurate and not contained in the report in question." Ramada said Mr. Manuel, a management consultant, was hired to "identify potential vulnerabilities in its Las Vegas casino operations."

18. The company said that while "isolated incidents" of alleged stealing have occurred, "most of these have been identified" and corrective action has been taken. The amount allegedly stolen, Ramada said, was "a very small fraction" of what the Journal reported and isn't inconsistent with the experience of other casinos. But a spokesman for Ramada said yesterday that the company wouldn't provide the figures for losses allegedly stemming from thefts.

19. *In addition, Ramada disputed the Journal's report that Mr. Manuel apparently had discovered that roughly $11 million in gambling markers, mostly from high-stakes gamblers in Mexico, supposedly were uncollectible.*

20. Ramada said that about $11 million in gambling debts were outstanding, including $5.8 million form [sic] players in Mexico, and that about $1.6 million were in the "active writeoff category." That proposition listed as possibly uncollectible wasn't "abnormal," Ramada said.

21. The Nevada Gaming Control Board, the investigative arm of the Nevada Gaming Commission, began an investigation of the Tropicana's alleged thefts on Tuesday and issued a news release yesterday covering the $11 million in gambling markers outstanding. The Gaming Control Board said that all but $1.6 million of the markers appareared to be collectable. The markers issued since Ramada took over the casino in January 1980 consist of current transactions and were issued properly, the board said. The board said auditors are continuing the investigation of the alleged skimming.

22. *A spokesman for Ramada said he couldn't discuss whether Mr. Manuel prepared a preliminary report containing the figures cited in the Journal story,* "Perhaps a preliminary report was corrected. I can't talk about any preliminary report. All I can talk about is the final report." He said he couldn't talk about the contents of the report because of attorney-client privilege.

23. In its statement yesterday, Ramada also said it waived the requirement that audited financial statements be provided by the previous operators of the Tropicana when Ramada purchased the gambling spa's assets because it wasn't purchasing the operators' corporation or its liabilities.

24. The Journal story said that Mr. Manuel couldn't compile an accurate financial picture because of the lack of prior financial statements.

25. A Ramada spokesman said Ramada correspondence repeatedly requesting that data, as reported by the Journal, was filed with the Securities and Exchange Commission. He added that the waiver of that condition in the purchase contract wasn't filed with the SEC.

26. Ramada also said that no lawsuit by the former Tropicana operators, alleging mismanagement of the Tropicana casino, "has been served on the corporation."

27. The Journal story said that a lawsuit had been filed in a federal court in Los Angeles.

28. Betram Fields, a Los Angeles lawyer representing the previous operators, said that he had prepared such a suit but hadn't yet filed it because "there are settlement negotiations under way and it may be resolved." He characterized the dispute as "mismanagement of the casino by Ramada but there are a lot of other legal issues." Ramada's purchase of the Tropicana assets is tied to a multiple of pretax earnings.

Upon Ramada's Motion to Modify the Summary Judgment Order entered September 30, 1987—GRANTED.

### ON MOTION TO MODIFY

■ Upon consideration of Plaintiffs' Motion to Modify the Summary Judgment Order, entered September 30, 1987, and Defendant's Opposition to the Plaintiffs' Motion to Modify the Summary Judgment Order Entered September 30, 1987 [Docket No. 236, filed January 12, 1988], it appears to the court that:

1. Ramada moves the court for an order amending that part of my Summary Judgment Order which granted partial summary judgment in favor of Dow Jones regarding those statements challenged by Ramada in

paragraphs 4 and 16 of the August 17, 1981 *Journal* article, which pertained to a suit brought by the former owners against Ramada based on mismanagement. In particular, the portion of my opinion now challenged by Ramada occurs on page 17, wherein I stated:

> The former owners did sue Ramada in February, 1981, however, the claims did not allege mismanagement of the casino. Rather, it pertained to a breach of Ramada's alleged agreement to provide the former owners with "veto power" over management decisions.

I concluded that, with respect to the challenged statements of paragraphs 4 and 16 of the article, Dow Jones' description of a filed lawsuit was substantially true, and defendant's motion for partial summary judgment was accordingly, granted. (*See* Summary Judgment Op., pp. 17–19.)

2. Plaintiffs move to modify that determination, contending that my conclusion was based on a transposition error involving two distinct litigations: the first suit, styled *Production & Leasing, Ltd. v. Hotel Conquistador, Inc., et al.*, which was filed in the United States District Court, District of Nevada, on February 25, 1981, and the second suit, styled *Hotel Conquistador, Inc. et al. v. Ramada Inns, Inc., et al.*, which was filed in the 8th Judicial District Court of the State of Nevada on December 15, 1983. Ramada points out that the August 17 article, paragraph 16, stated in pertinent part:

> 16. On top of that, the previous operators sued Ramada earlier this year, charging that Ramada is mismanaging the Tropicana, according to court papers filed in federal court in Los Angeles.

Ramada acknowledges that the *Hotel Conquistador* litigation was filed (although in state court) by Ramada's previous operators, and did in fact allege mismanagement. Ramada contends however, that it is patently clear that the August 17 article could not have been referring to this litigation, since it was filed nearly two (2) years *after* the August 17 article was published. Ramada argues that the *Journal* article must have been referring to the February, 1981,

litigation filed in federal district court, and styled as the *Production and Leasing, Ltd.* litigation, a case involving recovery on a corporate debt.

3. I am satisfied that a transposition error has occurred, and the summary judgment order should therefore be modified as follows:

> Viewing the evidence in a light most favorable to Ramada, the objective truth is as follows: As of the publication date of the challenged articles, August, 1981, the former owners of the Las Vegas Tropicana had not filed a suit against Ramada alleging mismanagement. Rather, the suit was filed by Productions & Leasing, Ltd., which sued not only Ramada, but the prior owners of the Tropicana as well. The suit did not, in any way, allege mismanagement. Rather, the plaintiff contended that *defendant HCI* (the former owners of the Tropicana) had entered into an agreement to purchase from plaintiff all of plaintiff's interests in the Folies Bergere Show. Plaintiff further alleged that defendant HCI failed to pay in full for the aforesaid purchase and that a subsidiary of Ramada was, in effect, a guarantor for payment of the remainder of the purchase price. Plaintiff included additional claims for misrepresentation, fraudulent conveyance, conspiracy, deprivation of civil rights and for relief under the civil RICO provisions. However, all of the additional claims pertained to the commercial transaction just described.

The "gist" or "sting" of the challenged statements appears to be that the former owners of the Las Vegas Tropicana were of the view that Ramada was mismanaging the Tropicana, and they therefore decided to bring suit against Ramada.

I note that Ramada does not challenge the portion of "Ramada's Gambling Operations" at paragraph 16 which states that "the previous operators claim that mismanagement of the operation by Ramada has kept the purchase price below what is should be." However, the precise truth is that Ramada and the prior operators of the Tropicana were both *defendants* in litigation initiated by *Pro-*

*duction & Leasing, Inc.* to collect on a debt in which Ramada's predecessors in interest had defaulted.

Comparing the precise truth to the alleged libel, I am satisfied that a reasonable juror could conclude that the August 17 article reporting mismanagement was more damaging in the mind of the average reader of the *Journal* than was the truth that the lawsuit initiated in February, 1981, actually concerned Ramada's alleged liability on a debt as a successor in interest. Accordingly, defendant's motion for summary judgment is DENIED.

Accordingly, Ramada's motion is hereby GRANTED, and the Order on Defendant's Motion for Summary Judgment, entered September 30, 1987, is modified to reflect the changes contained herein.

Upon Dow Jones' application to reconsider the issue of whether a public figure plaintiff may maintain a libel action based upon a theory of libel by omission, and to modify the opinion on defendant's motion for summary judgment—GRANTED.

## ON APPLICATION TO RECONSIDER

■ Upon (re)-consideration of the issue of whether an innuendo or inference resulting from the failure to print all relevant facts (i.e., libel by omission) is actionable in a defamation action instituted by a public figure plaintiff against a media defendant [Docket No. 273, filed January 11, 1988; Docket No. 241, filed January 18, 1988], and based on the contentions of the Ramada contained in its answer to Dow Jones' application [Docket No. 274, filed February 4, 1988], it appears to the court that:

1. Dow Jones has challenged that portion of the court's opinion on defendant's motion for summary judgment, filed September 30, 1987, which concerned the statement contained in paragraph 26 of the August 17 *Journal* article, which reported that a Las Vegas casino executive had estimated that the Ramada casino would need $24.8 million in monthly revenues in order to break even (the "break-even estimate"). In the referenced opinion, I held that although the statement was literally true, it was nevertheless actionable, since it might be construed to lead to a false inference. In this regard, I determined that since other estimates placed the break-even figure much lower (i.e., between $12–15 million), the $24.8 million break-even figure implied that Ramada would "be unable to achieve the necessary break-even figure because of the enormous size of the Atlantic City Tropicana and that the company will be under financial pressure because of losses." (Summary Judgment Op., p. 26). I concluded, therefore, that a reasonable juror could conclude that had the undisclosed facts (the lower break-even estimates) been reported, that would have been less damaging in the mind of the average reader of the *Journal* than was the failure to report the additional facts. Defendant's motion for summary judgment of this issue was accordingly, denied. (*See* Summary Judgment Op., pp. 25–28.) In this regard, I grounded my decision, to some significant extent, on the case of *Strada v. Conn. Newspapers, Inc.*, 193 Conn. 313, 477 A.2d 1005 (1984).

2. For the reasons articulated herein, I am satisfied that my opinion was in error and that Dow Jones cannot be held liable solely for its failure to include, or its omission of, the lower break-even estimates.

■ 3. Generally, "[b]efore there can be defamation of a public [figure] there must be a false statement of fact." *See Old Dominion Branch No. 496, Nat'l. Ass'n. of Letter Carriers v. Austin*, 418 U.S. 264, 283–284, 94 S.Ct. 2770, 2780–2781, 41 L.Ed.2d 745 (1974). *See also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 490, 95 S.Ct. 1029, 1043, 43 L.Ed.2d 328 (1975); *Restatement (Second) of Torts* § 581A (1977). Libel plaintiffs who are either public officials or public figures must prove both falsity and actual malice to recover. *See e.g., Bose Corp. v. Consumers Union Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *Time, Inc. v. Pape*, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968);

*New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 725–26, 728–29, 11 L.Ed.2d 686 (1964); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 563 (D.C.N.Y. 1984); *National Ass'n. of Gov't. Employees, Inc. v. Central Bdcstg. Corp.,* 379 Mass. 220, 396 N.E.2d 996 (1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed. 2d 788 (1980).

 It is well established that there can be no liability for publication of the truth about public [figures], regardless of motive. *See Garrison v. State of Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Even a publication which intentionally inflicts harm on a public official or a public figure is not actionable unless false. *See Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).

4. Although there is authority suggesting that a public figure plaintiff may never recover on the basis of libel by innuendo, *see Schaefer v. Lynch,* 406 So.2d 185, 188 (La.1981); *cf. Saenz v. Playboy Enterprises, Inc.,* 653 F.Supp. 552, 561–62 (N.D.Ill. 1987), the rule with respect to libel by omission where recovery has been permitted is that a public figure plaintiff has the burden of showing that what has been omitted has made an already published material assertion of fact untrue. *See Janklow v. Newsweek,* 759 F.2d 644, 648 (8th Cir.1985), relying on *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258–261, 94 S.Ct. 2831, 2839–41, 41 L.Ed.2d 730 (1974). *See also Loeb v. New Times Communications Corp.,* 497 F.Supp. 85, 91 (D.C.N.Y.1980); *Mihalik v. Duprey,* 11 Mass.App.Ct. 602, 417 N.E.2d 1238, 1240–41 (1981). *And see Speer v. Ottaway Newspapers, Inc.,* 828 F.2d 475, 478 (8th Cir.1987); *Myers v. Boston Magazine Co.,* 380 Mass. 336, 403 N.E.2d 376 (1980); *Ferguson v. Dayton Newspapers,* 7 Med.L. Rptr. 2502, 2505–06 (Ohio, 1981). *See generally* Lewis, *New York Times v. Sullivan Reconsidered: Time to Return to "The Central Meaning of the First Amendment",* 83 Colum.L.Rev. 603 (1983).

I am also satisfied that a re-evaluation of *Strada* indicates that the case is internally inconsistent. For that reason, I choose not to follow it.

6. Here, however, neither party contests the literal truth of the statement. Despite the existence of much lower break-even estimates, the *Journal's* failure to temper the reported estimate with the other lower estimates does not transform the true assertion into a falsehood.

7. For this reason, my opinion on defendant's motion for summary judgment is hereby modified to reflect that the statement contained in paragraph 26 of the August 17 *Journal* article pertaining to the $24.8 million break-even estimate is not actionable as a matter of law, and defendant's motion on this issue is, accordingly, hereby granted.

IT IS SO ORDERED.