# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE NATIONAL COLLEGIATE | ) | **Consolidated** |
| STUDENT LOAN TRUSTS | ) | **C.A. No. 12111-VCS** |
| LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: April 24, 2020
Date Decided: July 13, 2020

Kimberly A. Evans, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware and Charles T. Caliendo, Esquire of Grant & Eisenhofer P.A., New York, New York, Attorneys for Plaintiffs.

Jamie L. Edmonson, Esquire and Daniel A. O'Brien, Esquire of Venable LLP, Wilmington, Delaware and Allyson B. Baker, Esquire, Meredith L. Boylan, Esquire, Sameer P. Sheikh, Esquire and Tiffany C. Williams, Esquire of Venable LLP, Washington, DC, Attorneys for Defendant Transworld Systems Inc.

**SLIGHTS, Vice Chancellor**

This Memorandum Opinion addresses a discreet aspect of a broader dispute concerning several related Delaware statutory trusts—Plaintiffs, the National Collegiate Master Student Loan Trust I, *et al.* (the "Trusts"). In the broader dispute, several parties with various economic interests in the Trusts dispute key provisions of the Trusts' governing instruments and, in doing so, raise questions regarding the *de jure* management of the Trusts. The Court will address these disputes in due course when deciding pending motions for judgment on the pleadings under Court of Chancery Rule 12(c). Here, the Court decides the narrow question of whether the Trusts have stated a viable injurious falsehood claim against one of their service providers, Transworld Systems, Inc. ("TSI").[1] TSI has moved to dismiss that claim under Court of Chancery Rule 12(b)(6) (the "Motion").[2]

The Trusts were created to acquire and service student loans (allegedly worth billions of dollars) and to issue notes backed by the Trusts' assets.[3] TSI is a service provider the Trusts engaged to bring collection lawsuits on their behalf.[4] In their

[1] *See* Verified Am. Compl. for Injunctive and Equitable Relief and Damages ("Compl.") (D.I. 49) (filed in C.A. No. 2018-0167-JRS).

[2] Def. [TSI's] Mot. to Dismiss Pls.' Am. Verified Compl. (D.I. 65) (filed in C.A. No. 2018-0167-JRS).

[3] Compl. ¶¶ 2, 4–5.

[4] Compl. ¶ 4. I recite this fact without reaching or deciding the issues of whether TSI was properly engaged by the Trusts to perform its work, or whether the Trusts are authorized under the Trust documents to assert these claims. These issues are implicated by the broader dispute (to be decided) regarding the proper governance of the Trusts.

Verified Amended Complaint for Injunctive and Equitable Relief and Damages (the "Complaint"), the Trusts allege that TSI was not provided with the documents it needed to bring sustainable collection actions on behalf of the Trusts.[5] Despite this lack of documentation, and to prevent the statute of limitations from extinguishing debts worth more than "$268 million," TSI filed 94,046 collection lawsuits against delinquent borrowers on the Trusts' behalf.[6] In 1,214 of these cases, courts held the Trusts "lacked the documentation necessary to prove that the Trusts owned the loans."[7]

The several judicial determinations that TSI had filed debt collection actions prematurely prompted numerous borrowers to initiate unfair debt collection litigation against the Trusts. This consumer protection litigation has caused additional losses for the Trusts, and the Trusts now seek to hold TSI liable for these losses. For reasons unclear, the Trusts ground their claim not in breach of contract or negligence, but in the less frequently litigated tort of injurious falsehood.

As explained below, I am satisfied the Trusts have failed to plead a reasonably conceivable injurious falsehood claim against TSI. The Motion, therefore, must be granted.

---

[5] Compl. ¶ 77.

[6] Compl. ¶¶ 65, 91.

[7] Compl. ¶ 79.

# I. BACKGROUND

The Trusts collectively hold student loans with a face amount of ~$15 billion.[8] These loans did not "originate" with the Trusts.[9] Rather, the Trusts acquired these assets from other lending institutions.[10] As described in the Complaint, the Trusts purchased the loans in a two-step process. *First*, the originating institutions executed what the Complaint refers to as a "Pool Supplement Agreement."[11] This document "transfers . . . each student loan set forth on the attached schedule 1" to a separate entity called the "Depositor."[12] *Second*, the Depositor sold the loans "listed on Schedule 1" to the Trusts.[13]

Once the Trusts acquired the loans, they were then obliged to "service" them.[14] And "servicing" includes suing borrowers who fail to make scheduled

---

[8] Compl. ¶ 2. I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

[9] Compl. ¶ 74.

[10] Compl. ¶¶ 74–75.

[11] Compl. ¶ 74.

[12] *Id.*

[13] Compl. ¶ 75.

[14] Compl. ¶¶ 2–3.

payments.[15]  As a predicate to pressing these debt collection claims, the Trusts must demonstrate their ownership of the applicable student loan by producing the relevant Schedule 1.[16]  Without a Schedule 1, the Trusts cannot establish a "chain of title," and in the absence of such evidence, the Trusts may lack standing to sue delinquent borrowers.[17]

The system employed to service the loans was far from simple.[18]  Under a complex web of agreements, the details of which are not relevant to the Motion, Defendant, U.S. Bank National Association ("U.S. Bank"), the Indenture Trustee, was thrust into the role of servicing the loans in 2012, when the original servicer resigned.[19]  U.S. Bank then outsourced collections to multiple parties, one of which was TSI.[20]  According to the Complaint, another service provider was "required to instruct [other parties] to provide original documents [(such as the Schedule 1)] to TSI, but [] has failed to do so."[21]  In effect, this lack of documentation meant that

---

[15] Compl. ¶¶ 3–4.

[16] Compl. ¶ 73.

[17] Compl. ¶¶ 73, 81.

[18] Compl. ¶ 48 (depicting the complex relationship of various parties).

[19] Compl. ¶ 42.

[20] Compl. ¶¶ 4, 43, 46, 48.

[21] Compl. ¶ 77.

servicing responsibilities were "farmed out" to TSI in circumstances where TSI often lacked the documents necessary to prove the Trusts' standing to collect the debts.[22]

Despite the lack of documentation, TSI was still tasked with "pursuing defaulted loans."[23] And it did just that. During the course of its work for the Trusts, TSI filed at least 94,046 collection lawsuits.[24] In support of many of its debt collection claims, TSI submitted what evidence it could muster (such as testimony from its employees, Pool Supplement Agreements and affidavits asserting that various borrowers were in default) to prove the Trusts owned the student loans upon which the claims were based.[25] In many cases, however, courts have ruled the evidence TSI submitted did not carry the Trusts' burden to prove ownership of the student loan at issue.[26] As TSI's collection claims faced legal barriers, Trust assets

---

[22] Compl. ¶¶ 68, 72–73, 77 (Turnstile "failed" to "instruct Servicers to provide original documents to TSI.") (internal quotation omitted), ¶ 78 ("As a result of the failure to obtain and safeguard the Schedule 1s . . . it has become difficult if not impossible properly to foreclose on defaulted loans.").

[23] Compl. ¶ 77.

[24] Compl. ¶ 91.

[25] Compl. ¶¶ 80–84.

[26] *Id.*

worth hundreds of millions of dollars were at risk of becoming permanently uncollectable due to the passage of the applicable statute of limitations.[27]

In the wake of these failed collection lawsuits, student loan borrowers, as well as the Consumer Financial Protection Bureau (the "CFPB"), filed claims against the Trusts for alleged unfair debt collection practices.[28] For example, in a case captioned *Winslow v. Forster & Garbus, LLP*, a borrower sued certain attorneys TSI had hired to collect past-due payments.[29] The borrower alleged the attorneys violated the Fair Debt Collection Practices Act (the "FDCPA") as well as New York consumer protection laws.[30] Specifically, the borrower alleged the attorneys filed a collection lawsuit that falsely asserted one of the Trusts was the "original creditor" on her student loan when, in fact, the true "original creditor" was another institution.[31]

---

[27] Compl. ¶¶ 64–65.

[28] Compl. ¶¶ 90, 98–101.

[29] Compl. ¶ 101 (citing *Winslow v. Forster & Garbus, LLP*, 2017 WL 6375744 (E.D.N.Y. Dec. 13, 2017)). The Court may take judicial notice of the documents incorporated in the Complaint as well as "other publicly filed documents, including documents filed in related federal court proceedings." *Nelson v. Emerson*, 2008 WL 1961150, at *2 (Del. Ch. May 6, 2008) (citing *West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.*, 914 A.2d 636, 641 (Del. Ch. 2006) (taking "judicial notice of federal court decisions and orders" in the context of a motion to dismiss)); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 1992 WL 212595, at *12 (Del. Ch. Sept. 1, 1992) (stating that this court may take judicial notice of publicly filed documents on a motion to dismiss).

[30] *Winslow*, 2017 WL 6375744, at *1 (citing 15 U.S.C. § 1692).

[31] *Id.*, at *1, *3.

Even though the Trusts met a specific New York statutory definition of "original creditor," the court in *Winslow* held that the statement made by TSI's attorneys on behalf of the Trusts was both false and material.[32]  In reaching this conclusion, the court highlighted certain nuanced definitional distinctions between the FDCPA and New York state law.[33]

Along similar lines, the CFPB initiated an investigation and ultimately determined that certain TSI employees falsely certified personal knowledge of the relevant records relating to ownership while attempting to collect delinquent loans on the Trusts' behalf.[34]  Specifically, the CFPB found that TSI "lacked the documentation necessary to prove that the Trusts owned" the relevant loan in approximately "1,214" of the "94,046" total cases it had initiated.[35]

Believing TSI was to blame for their mounting consumer protection liability, the Trusts brought Count VII of the Complaint, where they allege TSI is liable for injurious falsehood by "knowingly and/or recklessly ma[king] false . . . statements concerning the Trusts . . . [when it] expressly or impliedly represented that the Trusts are legally entitled to foreclose on the loans, [] that the Trusts possess all of the . . .

---

[32] Compl. ¶ 101; *Winslow*, 2017 WL 6375744, at *10.

[33] *Winslow*, 2017 WL 6375744, at *10.

[34] Compl. ¶¶ 92, 96.

[35] Compl. ¶¶ 79, 91.

7

documents needed to prove standing to foreclose on the loans, [and] that the Trusts are the original creditors on the loans."[36] TSI has moved to dismiss Count VII under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[37]

## II. ANALYSIS

In ruling on the Motion, I accept the Trusts' well-pled factual allegations as true and draw all reasonable inferences in their favor.[38] The Motion may be granted only if the Trusts would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[39]

---

[36] Compl. ¶¶ 191, 192.

[37] Many documents relevant to the Motion were filed in the action captioned *National Collegiate Master Student Loan Trust I, et al. v. U.S. Bank National Association, et al.*, C.A. No. 2018-0167-JRS (the "U.S. Bank Case"). These documents include: D.I. 49 (the Complaint); D.I. 65 (the Motion); D.I. 66 (TSI's Opening Br. in Supp. of its Mot. to Dismiss Pls.' Am. Compl.); D.I. 83 (Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mot. to Dismiss or Stay ("PAB")); D.I. 94 (Reply Br. of Def. Transworld Sys. Inc. in Further Supp. of its Mot. to Dismiss Pls.' Am. Compl.). After the U.S. Bank Case was consolidated with *In re National Collegiate Student Loan Trusts Litigation*, Cons. C.A. No. 12111-VCS, the parties submitted additional letters relating to the Motion. (D.I. 383, 385, 389, 390).

[38] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[39] *Id.*

8

## A. The Tort of Injurious Falsehood

In the absence of controlling precedent, Delaware generally follows the RESTATEMENT (SECOND) OF TORTS § 623A when analyzing injurious falsehood claims.[40] Section 623A provides:

> [o]ne who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he *intends for publication of the statement to result in harm* to interests of the other having a pecuniary value, *or* either *recognizes or should recognize that it is likely to do so*, and (b) he knows that the statement is false or *acts in reckless disregard of its truth or falsity*.[41]

The parties agree that to plead a viable injurious falsehood claim, a plaintiff must allege the defendant made a false statement "about the plaintiff, his property, or his business."[42] The parties disagree, however, regarding the extent to which a false statement must be facially derogatory to be actionable.[43]

---

[40] *DeNoble v. DuPont Merck Pharm. Co.*, 1997 WL 35410094, at *5 (Del. Super. Ct. Apr. 11, 1997), *aff'd*, 1997 WL 776197 (Del. Dec. 4, 1997); *CapStack Nashville 3 LLC v. MACC Venture P'rs*, 2018 WL 3949274, at *5–6 (Del. Ch. Aug. 16, 2018); *Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313, 328 (Del. Super. Ct. 1987) (stating "Delaware follows the Restatement, Second, Torts in defamation-related issues").

[41] RESTATEMENT (SECOND) OF TORTS § 623A (AM. LAW INST. 2020) (the "RESTATEMENT").

[42] *See* The Trusts' April 24 Letter (D.I. 443) at 2–3 (citing *HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 759 n.1, 765 (Mass. 2013) and *Blatty v. New York Times Co.*, 728 P.2d 1177, 1183 (Cal. 1986)); TSI's April 24 Letter (D.I. 444) at 2 (same).

[43] *Compare* The Trusts' April 24 Letter (D.I. 443) at 4 (arguing a false statement need not be "inherently defamatory"), *with* TSI's April 24 Letter (D.I. 444) at 6 (arguing a false statement must be "derogatory").

Commentators have recognized that the tort of injurious falsehood has its roots in claims such as "slander of title," "product disparagement," and "trade libel," which were predicated on "the knowing publication of false material that *is derogatory* to the plaintiff's business."[44] The legal encyclopedias explain that an injurious falsehood claim must rest on a statement that is "*derogatory* to plaintiff's title, to his or her property or its quality, or to the plaintiff's business or personal affairs."[45] Even under an "expanded" view of injurious falsehood, this court (without squarely addressing the issue) has stated that a plaintiff must plead an "injury to economic advantage arising from *false derogatory* statements."[46]

---

[44] Rodney A. Smolla, *Injurious Falsehood*, 2 L. OF DEFAMATION § 11:34 (2d ed.) (emphasis supplied).

[45] *See, e.g.*, 53 C.J.S. *Injurious Falsehood* § 315 (2020) ("The elements of a cause of action for injurious falsehood are a false statement published to a third party, *derogatory to plaintiff's title to his or her property or its quality, or to the plaintiff's business or personal affairs*, intent to cause harm or knowledge that it is likely to do so, malice, and special damages.") (emphasis supplied).

[46] *CapStack*, 2018 WL 3949274, at *5 (emphasis supplied) (applying the RESTATEMENT). Other courts are in accord. *See Secure Identity Solutions, Inc. v. Maxwell*, 2014 WL 6065964, at *3 (D. Md. Nov. 12, 2014) (stating plaintiff must plead "a falsehood tending to disparage"); *Aoki v. Benihana*, 839 F. Supp. 2d 759, 771 (D. Del. 2012) (under New York law, "[i]njurious falsehood is a tort requiring the knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff."); *but see Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017) (stating that under the elements of trade libel ("a type of injurious falsehood"), "the statement need only be false, not necessarily defamatory").

On the other hand, the RESTATEMENT does not appear to require that a statement be facially derogatory to constitute an actionable injurious falsehood.[47] Instead, the RESTATEMENT simply requires that the statement's publisher "know enough of the circumstances so that he should . . . reasonabl[y] [] recognize the *likelihood* that . . . [the statement] will [] cause harm to the pecuniary interests of the other *because of [a third person's] reliance [on the statement]*."[48]

Ultimately, I do not answer the question of whether Delaware law requires a facially derogatory statement as an element of injurious falsehood because, for reasons I explain below, I am satisfied the Trusts have not met the arguably lower bar set by the RESTATEMENT.

**B. The Trusts Have Not Pled a Viable Injurious Falsehood Claim**

At bottom, an assessment of the viability of an injurious falsehood claim turns on an analysis of the underlying statements that give rise to the claim. As explained below, all of the allegedly false statements upon which the Trusts rely are not actionable for any one of three reasons.

---

[47] *See* RESTATEMENT § 623A cmt. a (stating the tort is not "limited" to "disparagement" of property or intangible things or of their quality); *see also* William L. Prosser, *Injurious Falsehood: the Basis of Liability*, 59 COLUM. L. REV. 425, 426 (1959) (observing that the tort has been applied to "statements which cause financial injury to plaintiff, but which cast no reflection upon either his personal reputation or his property," providing as examples false statements that a plaintiff "is dead," "has gone out of business" or has taxable income that results in "income tax trouble").

[48] RESTATEMENT § 623A cmt. b (emphasis supplied).

11

*First*, as I have noted, TSI's allegedly false statements must be *about* the Trusts, the Trusts' property or the Trusts' business to be actionable.[49] Courts have declined to "expand" the injurious falsehood tort to statements that cause pecuniary harm but are "about something other than the plaintiff, his property, or his business."[50]

Many of the statements the Trusts identify are not *about* the Trusts.[51] For example, the Trusts point to the fact that TSI filed collection lawsuits even though it "lacked documentation necessary to prove the Trusts owned" specific loans or that TSI's employees falsely swore they had personal knowledge of records evidencing certain loans.[52] These are not statements *about the Trusts*; they are statements *about*

---

[49] *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 604 (Mo. Ct. App. 2009); The Trusts' April 24 Letter (D.I. 443) at 2.

[50] *Stein*, 284 S.W.3d at 604.

[51] *See About*, MERRIAM-WEBSTER (last visited June 18, 2020), https://www.merriam-webster.com/dictionary/about (defining "about" to mean "with regard to: concerning," "concerned with," "fundamentally concerned with or directed toward").

[52] *See* Compl. ¶ 79 ("TSI . . . lacked the documentation necessary to prove that the Trusts owned the loans" and "a complete chain of assignment . . . was lacking."), ¶¶ 80–82 (The Trusts "failed to establish the chain of title."), ¶¶ 93–94 (TSI employees "lacked access to deposit and sale agreements" and falsely "asserted that they had personal knowledge that the loans were transferred."); PAB at 102–03.

*the evidence* TSI did (or did not) possess, or about the state of TSI's employees' knowledge relating to the ownership issue.[53]

*Second*, reading the Complaint as a whole, some of the statements on which the Trusts rely are not alleged to be false.[54]  To the extent the Trusts rely on TSI's statements that the "Trusts are legally entitled to foreclose on the loans," the Trusts have not pled this statement is false.[55]  Rather, the Trusts have pled the Trusts *did*, in fact, own the relevant student loans and were entitled to collect on them, but other parties lost the paperwork required to *prove* the requisite ownership in court.[56]

---

[53] *See* Compl. ¶ 79 ("TSI . . . lacked [] documentation necessary to prove that the Trusts owned the loans."), ¶ 93 (TSI employees "lacked access" to relevant information.).

[54] *See Ramada Inns*, 543 A.2d at 329 ("To recover under injurious falsehood, Ramada must show that Dow Jones published a false statement.")

[55] *See* Compl. ¶ 2 (alleging the Trusts own student loans worth "approximately $15 billion"), ¶ 4 (alleging certain lawsuits to collect on defaulted loans "have been dismissed," not because the Trusts did not own the relevant loan, but because "Defendants failed to obtain the documentation necessary to *prove* the Trusts' ownership of the loans") (emphasis supplied).

[56] *See* Compl. ¶ 71 ("Defendants have filed, in the name of the Trusts, lawsuits throughout the country *seeking to collect on defaulted loans.*") (emphasis supplied), ¶ 72 ("[R]ecord keeping failures, however, have impeded the Trusts' ability to collect from borrowers who have defaulted on their loans."), ¶ 76 ("Defendants, however, have failed to obtain and safeguard the Schedule 1 to each Pool Supplement Agreement."), ¶ 77 ("The Defendants involved in pursuing defaulted loans, including . . . TSI, have failed to obtain the Schedule 1s and other documents needed to prove ownership of the loans."), ¶ 80 (alleging a court dismissed one of the Trust's collection lawsuits for failure "to provide the court with a copy of Schedule 1"), ¶¶ 81–83 (same).

*Finally*, the Trusts allege TSI "falsely represented that the Trusts are the original creditors on the loans."[57] In the context in which the Trusts allege these statements were made (i.e., legal actions involving complex and conflicting statutory definitions filed to collect debts the Trusts were, in fact, owed), it is not reasonably conceivable that TSI should have recognized a third person would "act in *reliance*" upon this statement in a way that was *likely* to cause the Trusts pecuniary harm.[58]

The RESTATEMENT clarifies that the law does not require speakers to "take the risk that by some unlikely possibility his casual statement may" cause pecuniary harm.[59] Rather, a statement's publisher must "know enough of the circumstances" such that he should recognize "the likelihood that some person will act in reliance upon his statement, or that it will otherwise cause harm to the pecuniary interest of the other *because of the reliance*."[60] There must be a direct, foreseeable connection between the false statement, a third person's reliance and harm to the plaintiff's interests.[61]

---

[57] Compl. ¶ 191.

[58] RESTATEMENT § 623A cmt. b.

[59] *Id.*

[60] *Id.*

[61] *Id.*

Here, in contrast, the Trusts have not pled the requisite, direct, foreseeable reliance upon the "original creditor" statement.[62] This conclusion holds even if the "original creditor" statement was false and even if TSI employees could have foreseen that their desperate collection efforts on the Trusts' behalf could, indirectly, damage the Trusts.[63] It is simply not reasonably conceivable that the "original creditor" statement "played a material and substantial part in *influencing the conduct of others*, and that in consequence [the Trusts have] suffered special damage."[64] Stated differently, no party heard the "original creditor" statement and, believing the statement to be true, acted (or refrained from acting) in a way that proximately harmed the Trusts.[65]

In this regard, the Trusts' citation to the 1941 New York case, *Gale v. Ryan*, is misplaced but also instructive.[66] *Gale* involved defendants who "intentionally"

---

[62] Compl. ¶ 101.

[63] RESTATEMENT § 623A cmt. b; *see also Zippay v. Kelleher*, 638 S.W.2d 292, 294 (Mo. Ct. App. 1981) (holding that a plaintiff must allege "a direct causal relationship between [a third person's] *reliance* and plaintiff's damages") (emphasis supplied).

[64] William L. Prosser, *Injurious Falsehood: the Basis of Liability*, 59 COLUM. L. REV. 425, 426 (1959) (emphasis supplied); *Zippay*, 638 S.W.2d at 294 (reaching the same conclusion after a similar analysis).

[65] *See Zippay*, 638 S.W.2d at 294–95 (providing, as an example of a classic injurious falsehood claim, a situation where patrons falsely are told by the defendant that a hotel has no rooms available and, therefore, can be "expected to seek accommodations elsewhere").

[66] *See* D.I. 443 at 8 (citing *Gale v. Ryan*, 263 A.D. 76 (N.Y. App. Div. 1941)).

published "fraudulent" tax reports to the IRS that directly caused the IRS, in reliance on the truth of such reports, to investigate the plaintiff.[67]   In contrast, the Trusts allege TSI hired attorneys who published false statements in litigation papers in an over-zealous effort to overcome the Trusts' lack of documentation.[68]   After those cases concluded, parties filed retaliatory actions alleging the Trusts and their agents' aggressive litigation practices violated state and federal law.[69]   These retaliatory actions were not based upon any action taken in direct *reliance* on the truth of TSI's statements.[70]   To the contrary, the actions were based on allegations that the statements themselves, even if not relied upon, violated positive law regulating the fair collection of delinquent debts.[71]

More fundamentally, after giving the Trusts the benefit of all reasonable inferences, the facts they have alleged simply do not fit within the injurious falsehood framework.   "[A]s traditionally understood, [injurious falsehood]

---

[67] *Gale*, 263 A.D. at 77–78.

[68] Compl. ¶ 101.

[69] Compl. ¶ 98 ("[N]umerous lawsuits have been brought against the Trusts by borrowers because of alleged improper servicing/collection activities.").

[70] Compl. ¶¶ 98, 100–01; *Reliance*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining reliance as "dependence or *trust* by a person, esp. when combined with action based on that dependence or trust") (emphasis supplied).

[71] Compl. ¶ 98; *see, e.g.*, *Winslow*, 2017 WL 6375744, at *4 (alleging the Trust was *not* the "original creditor").

addressed false statements about a competitor's products—statements of a kind that could damage or destroy a competitor."[72]  Even though the tort may have evolved somewhat over time, it would contradict the tort's fundamental nature to stretch the law of injurious falsehood as far as the Trusts have urged here.

## III.  CONCLUSION

For the foregoing reasons, TSI's Motion to Dismiss is **GRANTED**

**IT IS SO ORDERED.**

---

[72] *CapStack*, 2018 WL 3949274, at \*5.